STATE OF NEBRASKA V. STATE JOURNAL COMPANY.*

FILED DECEMBER 21, 1906. No. 13,833.

1. **Principal and Agent.** An agent cannot avail himself of any advantage his agency may give him to profit out of the subject of the agency beyond the agreed compensation for his services.

2. **Contract: SUPREME COURT REPORTS, PUBLICATION OF.** The contract of the state with the defendant to print and manufacture for the state certain volumes of the supreme court reports, and that the "plates" upon which such printing was done should be delivered to, and become the property of, the state, did not constitute the defendant the agent of the state in the "publishing business."

3. ———: ———. Under such contract the law will imply an agreement on the part of the defendant not to use the property of the state, intrusted to its care to enable it to perform its contract with the state, for any other purpose than that contemplated in the contract. By a violation of such implied agreement it would become liable to the state for the value of such unauthorized use, and also for any injury done to the property thereby.

4. **Copyright.** The word copyright is generally used to mean the "exclusive right of multiplying copies of a work already published." This right can only be preserved by complying with the act of congress for that purpose. The word has sometimes also been used to denote the right which an author has in his literary work to keep it for his own private use, to publish it, or to refrain from publishing it, at his pleasure. This right exists at common law. It does not depend upon any statute. It can only exist

---

* Motion for leave to file amended petition overruled. See opinion, p. 771, *post.*

as long as the work is kept private. If it is published without complying with the copyright act the right is abandoned.

5. **Literary Property:** CONTRACT. The literary matter intrusted to the defendant to enable it to perform its contract with the state was not copyrighted, and had already been given to the public. Any citizen of the state had full right to print and sell the same on his own account. The law therefore will not imply an agreement on the part of the defendant not to manufacture and sell volumes containing such literary matter on its own account, there being no such limitation in the contract between the parties.

ORIGINAL action for damages for breach of contract. Defendant demurred. *Demurrer sustained and action dismissed.*

*Norris Brown, Attorney General,* and *W. T. Thompson,* for plaintiff in error.

*Hall, Woods & Pound, contra.*

SEDGWICK, C. J.

When the ruling upon the second demurrer was sustained for the reasons stated in the opinion, 75 Neb. 275, a motion for a new trial was filed, this being an action brought originally in this court. Upon this motion the attorney general filed an able and exhaustive brief. The propositions of law advanced by him as showing that our former decision was wrong are vigorously supported both in his brief and upon the oral argument. Many decisions of other courts, both in this country and England, are cited and discussed with earnestness and ability. It became very manifest that, whatever might be thought of the conclusion reached by this court, the opinion filed had not served its intended purpose; it had not made plain the views of the court upon all the legal principles upon which a right determination of the case must rest. The case is an important one both on account of the amount involved, if the contentions of the state are sustained, and on account of the character of the allegations upon which the claim of the state rests.

In the brief filed and upon the argument the state admits that it has no claim "for infringement of copyrights or for damages for misuse of literary productions." The position taken by the state upon this point is stated in the brief in these words: "It is correctly stated in the opinion that all persons have a right to publish the decisions of this court. The West Publishing Company does so. It buys copies of the opinions from the reporter of this court. It edits its own manuscripts, sets its own type, makes its own plates, prints its own copies, binds them, and sells them openly to the public." We do not think that the counsel for the state have fully appreciated the quality and force of this admission. The importance of the fact so admitted must be continually borne in mind in the investigation and determination of the questions involved. The literary matter involved in these reports became the property of the public before the manuscripts, or any other property of the state, were placed in the hands of the defendant to enable it to carry out the terms of its contract with the state. The syllabi of the opinions are regularly published in the newspapers of the state as soon as the decisions are rendered, and frequently extracts from the opinions, and sometimes the opinions themselves, are also so published. Copies of the opinions as well as the syllabi are furnished to any and all parties desiring them upon payment for copying them, and no attempt is made to preserve any claim on the part of the state in these syllabi or opinions. It was therefore impossible that the defendant should cause any injury to the state by making this matter public.

What interest or right of the state then has been interfered with or damaged by the acts of the defendant? The answer of the state's brief is: "The state engaged in the enterprise of publishing the decisions of the supreme court for the purpose of creating a fund to buy books for the state library. * * * For the purpose of creating a fund to purchase books for the benefit of the state library the state has by statute made provision for engaging in

the business of publishing the supreme court reports. The care of the state library and the enterprise of publishing the supreme court reports for the benefit thereof has been by the constitution and statutes committed to this court and its officers. * * * The constitution and statutes, therefore, have placed on this court and the reporter the responsibility for the management of the state's enterprise of publishing the supreme court reports, and the judges of the supreme court constitute a board of directors of the law division of the state library. Both the library and the means of creating the funds by which it is kept up are exclusively within the jurisdiction and management of the supreme court and the reporter thereof. This official power carries with it the responsibility for the proper management of the publishing enterprise, the funds created thereby, and the library books when purchased." We do not coincide with the view that the main purpose of the statute is to establish a printing and publishing business to make profits with which to replenish the library funds. The purpose would seem rather to be to make the opinions of the court easily accessible to all the citizens. We will assume, however, for the purpose of this discussion, that one of the objects of the state was to realize a profit upon the sale of the reports, and that the intention was to use that profit for the benefit of the library fund.

1. The first point stated in the argument is: "Defendant accepted employment in the state's publishing enterprise, and thereafter could make no clandestine profit out of its employer's business, and such profit belongs to the state." It is not entirely clear whether counsel intended to urge that this rule is applicable more especially to publishing enterprises, or whether it is the relation of principal and agent which they are intending to present in the discussion of this proposition. The first case cited under this point in the argument is an old English case, in which the defendant was employed by the plaintiff to make copies of certain drawings, and, while in that employment,

made other copies on his own account. Then follows the citation of a large number of cases from the courts of this country, in which the general doctrine is held that the agent cannot, without the consent of his principal, acquire an interest in the subject matter of the agency adverse to the interest of his principal. After citing these cases illustrating the law of principal and agent, a case is cited involving the right of a photographer to sell or exhibit copies of photographs, and other cases not depending upon the law of principal and agent.

Let us first inquire how the law of principal and agent affects the determination of this case. As before stated, a great many authorities on this question are cited in the brief, but they are all substantially to the same effect. In *Cottom v. Holliday*, 59 Ill. 176, the court in its opinion used this language: "The duties and obligations of an agent are such that he cannot avail himself of any advantage his position may give him to speculate off his principal. All the profits or advantages gained in the transaction belong to the principal." This expression is copied in the brief as being applicable to the facts in this case, but to our minds the rule of law declared in *Cottom v. Holliday* has no application whatever to the case at bar. In that case Mr. Cottom had employed Holliday to buy for him a piece of land from one Ritchie. Mr. Holliday purchased the land, and reported to Mr. Cottom that the land cost more than in fact it really did, and so obtained from Cottom more money than he was entitled to. It was held that Holliday, being the agent of Cottom to transact this business, could not be allowed to "speculate off his principal" in such manner. In the case at bar the defendant was not employed as an agent to carry on a printing and publishing business for the state. Its contract was to manufacture certain plates and certain books for the state. When they were manufactured they were to be delivered to the state and the defendant paid a certain agreed price therefor. This was the special employment of the defendant by the plaintiff. It was not

acting as the agent of the state in making these plates and books. It did the work in its own name. The state could not be held responsible for any acts or omissions of the defendant, or any contracts entered into or liabilities incurred by it in carrying out this contract with the state. One who contracted with a wagon maker to make him a wagon, and loaned the wagon maker certain tools with which to do the work, could with equal reason claim to be the owner of, or have some property interest in, a second wagon made by the wagon maker from his own materials while he was engaged in the contract with his employer, on the ground that the wagon maker was his agent in the enterprise of making wagons and could not speculate on his employer's business. In *Cottom v. Holliday, supra,* it was said: "The law will not permit the agent, without the assent of his principal, to acquire an interest in the subject matter of the agency adverse to that of his principal." If the defendant was the agent of the state in the transaction set out in the petition, what was the subject matter of that agency? It certainly was not to conduct a publishing enterprise. If the subject matter of the agency was the plates and books to be manufactured and delivered to the state, then the defendant has not acquired or attempted to acquire any interest in such subject matter.

2. One of the oldest cases cited by the state, and a case which may be regarded as a leading one, is *Pulcifer v. Page,* 32 Me. 404, 54 Am. Dec. 582. In that case the facts were that the plaintiff and defendant each had an iron chain which had been broken into various pieces. The plaintiff took the pieces of the two chains to a blacksmith and had them united so as to make two other chains. The defendant took one of these chains, and the plaintiff brought the action to recover from him. The court in stating the case began with this expression: "This case presents a question of acquisition of property by accession, but does not involve an inquiry concerning the admixture or confusion of goods. It is a general rule of

law that if the materials of one person are united to the materials of another, by labor, forming a joint product, the owner of the principal materials will acquire the right of property in the whole, by right of accession." Counsel surely are not seriously contending that the principle involved in the case cited has anything to do with the case at bar. The materials of the state were the manuscripts of the literary matter and the plates from the time the plates became the property of the state. No materials of the defendant were united to the materials of the state in any way. There was no joint product produced.

3. The proposition is stated in the brief that, when one employs another to manufacture pictures or books for him, the person so employed has no right to make any other copies for his own benefit. Several cases are cited as illustrating this proposition and its application to the case at bar. *Pollard v. Photographic Co.*, 40 L. R. Ch. Div. 345, is one of the cases relied on. That was an action to restrain the defendant "from selling, or offering for sale, or exposing by way of advertisement or otherwise a certain photograph of the plaintiff, Alice Morris Pollard, got up as a Christmas card, and from selling, or exposing for sale or otherwise dealing with such photograph." The lady was photographed at defendant's shop, and paid for a likeness of herself taken from negatives then made. "It was found by the plaintiff that a photographic likeness of Mrs. Pollard taken from one of the negatives, got up in the form of a Christmas card, was being exhibited in the defendant's shop window at Rochester." In the course of the argument one of the judges remarked: "Injunctions have been granted to restrain a libel." The photograph was a private matter, it never had been published, and the attempt to publish it on the part of the defendant was the injury complained of. The case illustrates the doctrine of the right of privacy. This right of the plaintiff to prevent her photograph being made public against her wish was so well established in English law that it was unnecessary to discuss that right. The question dis-

cussed was whether she had waived that right by employing the photographer to make the negative without at the same time stipulating that he should not publish it, and the court held, after much discussion, that it was not necessary to make the express stipulation in the contract that they should not be published, that such stipulation would be implied, and this is the whole matter discussed in the case. The court referred to several other cases, some of which are cited and relied on by the state in this case, and then said that the cases referred to were the cases "in which there was some right of property infringed, based upon the recognition by the law of protection being due for the products of a man's own skill or mental labour." The court then stated that an English statute provides: "When the negative of any photograph is made or executed for or on behalf of another person for a good or valuable consideration, the person making or executing the same shall not retain the copyright thereof, unless it is expressly reserved to him by agreement in writing signed by the person for or on whose behalf the same is so made or executed; but the copyright shall belong to the person for or on whose behalf the same shall have been made or executed." So that by express statute in England the plaintiff had a right to her photographs, and might copyright them, if she chose. In this connection it will be remembered that the author of a manuscript is in this country not obliged to give it to the world, he may keep it as a private matter as long as he does not publish it, and at any time when he decides to publish it he may obtain a copyright thereon; so that, while he holds the matter unpublished, he has a special interest in it which would entitle him to prevent its publication. The English statute gave a similar right to one who was photographed to prevent the photograph from being made public. In the state's brief it is said that this case was followed by the United States circuit court for the district of Massachusetts in *Corliss v. Walker Co.,* 57 Fed. 434. In that case an injunction

was allowed in the suit of Mrs. Corliss to prevent the publication of a picture of Mr. Corliss, who was then deceased. Afterwards a motion was made to dissolve this injunction. This motion was sustained, and in passing upon this motion the court said: "But, while the right of a private individual to prohibit the reproduction of his picture or photograph should be recognized and enforced, this right may be surrendered or dedicated to the public by the act of the individual, just the same as a private manuscript, book, or painting becomes (when not protected by copyright) public property by the act of publication." *Corliss v. Walker Co.*, 64 Fed. 280. Distinctly holding, and construing *Pollard v. Photographic Co.*, *supra*, also as holding, that it is the publication of the photograph or writing that the law would prohibit, and that this right to so prohibit this publication is "surrendered or dedicated to the public * * * by the act of publication." These cases and other similar cases plainly have no application to the making of pictures or printing of matter that has already been given to the public.

Another case quoted from in the brief and strongly relied upon by the state is *Tuck & Sons v. Priester*, 19 L. R. Q. B. Div. 629. In the syllabus the case is stated as follows: "The plaintiffs employed the defendant, who was a printer in Berlin, to make for them copies of a drawing of which they had the copyright. The defendant executed the order, and also, without the plaintiff's knowledge or consent, made other copies, and imported them into England. After this the plaintiffs registered their copyright under 25 & 26 Vict. c. 68, and after the registration the defendant sold in England some of the copies which he had imported." The court held: "There was an implied contract that the defendant should not make any copies of the drawing other than those ordered by the plaintiffs, and that, independently of the statute, the plaintiffs were entitled to an injunction and damages by reason of the defendant's breach of contract." It

is this holding that is quoted and relied on by the state.
It is manifest that the meaning and force of this holding
has been entirely misunderstood.  These pictures had
never been published.  The plaintiffs were procuring them
to be made for the purpose of disposing of them to the
public for the profit of the plaintiffs themselves.  Every
principle stated in the opinion is inconsistent with the
idea that the court was dealing with matters that had
already been given to the public.  This fact must be kept
in mind in ascertaining what was in reality decided in
the case.  Another important matter has been overlooked
in the plaintiff's discussion.  It is mentioned in the opin-
ion of Lindley, L. J.  He said: "I am quite aware of the
ambiguity of the word 'copyright,' but that which is
called 'copyright' at common law has been shown by the
decision of the House of Lords in *Jefferys v. Boosey* to
be an incident of property and nothing more.  'Copyright'
under the act is something far beyond that; it is the ex-
clusive right of multiplying copies of a work already
published."  In the discussion of the case before the divis-
ional court the difficulties which have arisen from this
ambiguous use of the word 'copyright' are plainly pointed
out.  The word has sometimes been applied to the "right
to publish, or to abstain from publishing, a work not
yet published at all."  This is the common law right which
every one has in his own productions, whether they be
literary, ornamental or of a more substantial nature.  He
may keep them entirely to himself as long as he chooses,
and, while he does so, he has an exclusive right to them,
and no person has a right to interfere with them or de-
stroy them.  To make them public would be to destroy
this right.  This right is perhaps not strictly a copy-
right, but that name has frequently been applied to it,
and in the case under discussion it is said by a majority
of the court to be a copyright.  Whatever it may be called,
it is the registering of this right, or in our country the
complying with the law in regard to copyright, which pre-
serves the right in the work after it has been published.

Unless the copyright laws are complied with, publication works an abandonment of all further right. Grove, J., of the divisional court quoted the following language from Lord Brougham: "Whatever may have been the original right of the author, the publication appears to be of necessity an abandonment; as long as he kept the composition to himself, or to a select few, placed under conditions, he was like the owner of a private road; none but himself or those he permitted could use it; but when he made the work public he resembled that owner after he had abandoned it, who could not directly prohibit passengers, or exact from them a consideration for the use of it." *Tuck & Sons v. Priester*, 19 L. R. Q. B. Div. 48, 55. A further quotation is made from language used by Lord Brougham in speaking of a copyright in the sense of exclusive right of multiplying copies of a work already published, as follows: "That which was before incapable of being dealt with as property by the common law became clothed by the lawgiver's acts with the qualities of property, and thus the same authority of the lawgiver, but exercised righteously and wisely for a legitimate and beneficent purpose, gave to the produce of literary labour that protection which the common law refused it, ignorant of its existence, and this protection is, therefore, in my opinion, the mere creature of legislative enactment." These pictures had never been published. The court recognized the right which the designer and maker of the pictures had to keep them for his own private use, and to publish them or refrain from publishing them at his pleasure. That right, which was independent of their statute, was violated by the defendant, and the discussion is as to whether under the circumstances there was an implied contract that the defendant should not violate that right. The court found that there was such an implied contract and so allowed the plaintiff to recover damages. After publication nothing but compliance with the statute will save the right. This is the ordinary and strictly proper use of the word copyright—the right to make it public and

still retain the beneficial interest in it.  No right remains in a literary production which has been made public, except under the federal copyright act.  This is the sense in which the word copyright was used in the former opinion.  The fact that the state had dedicated to the public the literary matter embraced in the manuscript furnished to the defendant, by furnishing it to the West Publishing Company for publication, and in various other ways pointed out above, was not denied in the petition and was understood by all parties.  Upon this understanding the case was presented to the court.  Upon the theory that this was private matter, and had never been dedicated to the public, the proposition of law involved in the first paragraph of the former opinion would not be technically correct, and the same might be said of some of the expressions of the opinion.

The case of *Murray v. Heath*, 1 Barn. & Ad. (Eng.) 698, was decided in England in 1831.  The plaintiff delivered certain drawings to the defendant to be by him engraved on copper plates for the plaintiff's sole use.  The defendant engraved the drawings for the plaintiff, but while the drawings and copper plates were in the hands of the defendant he took off impressions on paper from the plates for his own use, and this was the foundation of the action against him.  In the first count against the defendant it was alleged "that the plaintiff was possessed of and had the right to the sole use of" the drawings in question; and, in the seventh count, "that the plaintiff was entitled to the pecuniary profit, benefit, and advantage to be derived in any way from all impressions taken and to be taken" from the copper plates; and, in the eighth count, "that the plaintiff was the *proprietor* of certain prints, which had been etched and engraved (named them), and had and was entitled to the sole right and liberty of printing and reprinting the same."  The other counts are not set out in the opinion.  These allegations in these three respective counts do not appear to have been denied.  No question was made in regard to these allegations.  They

were necessary and material allegations, and if the draw-
ings had been published these allegations would have been
untrue. In that case the public, and any person that de-
sired to, would have the liberty of printing and reprint-
ing the same, and the plaintiff would have no such sole
right. Upon the theory, however, that the allegations
were true, and that the plaintiff did have the sole right,
and that "the engraver had contracted to engrave the
plate, and to appropriate the prints taken from it to the
use of another, an action at common law would lie against
him from the breach of that contract." If the engraver
took copies of these drawings and offered them for sale
to the public, such an injury would require no act of
parliament to put an end to it. The court so declared in
these words: "The injury complained of in this case re-
quired no act of parliament to put an end to it; for the
engraver having contracted to engrave the plate, and to
appropriate the prints taken from it to the use of another,
an action at common law would lie against him for the
breach of that contract." This expression of that court
is quoted in the briefs and appears to be much relied on.
It plainly has no bearing upon the right of the defendant
in this case to copy and publish the supreme court reports.
The state had the right in the manuscripts and in the
plates, and the defendant did wrong in using them with-
out the consent of the state, and would be liable under
suitable allegations for such injury as the state suffered
by reason thereof. The contract between the plaintiff and
the state was of such a nature that the agreement on the
part of the defendant not to use the plates and manuscripts
of the state for such purpose might be reasonably implied,
because the defendant had no right to so use them; but
we cannot imply from the contract an agreement not to
do that which the defendant in common with all other
citizens had full right to do. When the contract was
made both parties must have known that the defendant
had the right to obtain and publish the opinions of the
supreme court. There was nothing in the contract incon-

sistent with that right, and no implication can be drawn from the contract that the defendant renounced or waived that right. The injury to the state, then, is in the use that the defendant has made of the manuscripts and plates, and does not arise from the manufacture and sale of the volumes of the reports, which the defendant might have done by other means and without the use of the plaintiff's property.

4. It is said in the brief that the rule contended for has been stated in a different form as follows: "Where material is delivered by the owner to a workman to be worked up, together with some additional materials to be furnished by the workman, into a manufactured article, the general doctrine is that the property in the finished product, including the accessorial material furnished, remains in the original owner." What material of the state has been worked up with other material into a manufactured article? The only "materials" delivered by the state to the defendant are the written manuscripts furnished, and the plates made by defendants for the state. Have these been worked up, together with some additional material, into books now in defendant's possession? Can such authorities be seriously regarded as applicable to this case?

5. It is argued that the court was wrong in holding in the former opinion that no confidential relations were created between the parties by the contract in question, except such as arises from ordinary contracts of employment or bailment. Without doubt the law will imply an agreement on the part of the defendant not to use for its own private purposes the property of the state, entrusted to defendant's care to enable it to carry out the contract; and, so far as defendant has done so, it is liable to the state for such damage as it has suffered on that account. The measure of such damages is pointed out, and we think correctly, in the former opinion. The state has a right to control the use of its own property, and, when by contract it places its property in the hands of its employees

for a special purpose, the law, in the absence of anything in the contract to the contrary, will imply an agreement that the property shall be used only for that purpose. This is because any further use of it would violate the right of the state to control its use. This principle cannot extend to the making and selling the reports on defendant's own account, because this did not violate a right of the state. The state could not restrict the right of any citizen to make and sell these reports, because they had been already published, and were not copyrighted. If the state had required the defendant to stipulate in the contract that it would not make and sell any copies of the reports on its own account, it may be that such stipulation could have been enforced. The law will not imply such a stipulation in the contract, when, in fact, none exists, because the state had no private ownership in the literary matter; that private ownership, if any ever existed, having been waived and abandoned by publication. The state therefore had no right that could be violated by making and selling the reports, and there is no basis for the implication of an agreement on the part of the defendant that it would not make and sell reports on its own account.

We think that the judgment heretofore entered is right and it is adhered to.

DEMURRER SUSTAINED AND ACTION DISMISSED.

LETTON, J., dissenting.

The former opinion of the court, and the opinion of Chief Justice SEDGWICK, filed herewith, in substance, hold: (1) That the state has no literary property in the opinions of the supreme court so that the defendant or any other person can be restrained from printing and publishing the same upon its own account as an independent enterprise; (2) that the allegations of the petition with reference to recovery of damages are insufficient to support

an action at law for damages.  So far I concur with the majority.

These propositions being settled there still remains the inquiry whether, under the conditions of the contract between the parties, the defendant has been guilty of, and is threatening such a violation of its terms as a court of equity will grant an injunction to restrain, on account of the inadequacy of the remedy by suit at law.  The contract between the parties was entered into with knowledge by the defendant of the statute providing for the publication and sale of the supreme court reports.  This statute became a part of the contract, of which the defendant was bound to take notice.  It knew therefore that the purpose of the contract was to procure 1,000 copies of each original volume and 500 copies of each duplicate to be printed from the state's own plates furnished from its vaults, for the purpose of distributing a certain number of the copies to various officers and libraries, and of selling a much larger number, to create a library fund for the benefit of the state library.  It was therefore fully aware that the preparation of the manuscripts, the indexing, editing, proof reading, and the arrangement of the contents of each volume was performed under the contract by the officers of the state for the pecuniary benefit of the state.  This was not the only object, but it was one of the purposes of the contract.

It may be laid down as a general principle that no person has the right to use the property of another contrary to the will and against the interest of its owner.  This rule applies with greater force where the property of one has been delivered to another under a contract to use it for certain specified purposes, and when the unauthorized use of the property for the benefit of the wrongful user would defeat the very object of the contract.  When the state employed the defendant to print from its materials, furnished for the purpose, several thousand copies of supreme court reports, which the law prohibits the reporter of the supreme court from selling at less than a specified

price, if the defendant might use these plates and print an unlimited number of copies for its own use and sell at any price, the effect might be to deprive the state of any benefit from the contract and leave it with the books it had paid for a useless burden on its shelves. If such were the only force and meaning of the agreement, no man of ·rdinary business capacity would ever enter into it. Lord Holt said: "Every man's bargain ought to be performed as he intended it," and to believe that the contract entered into would permit such conduct on the part of the defendant would be to say that the state's officers were void of ordinary judgment.

With that portion of the opinion of Chief Justice SEDG-WICK quoted hereafter I therefore concur: "The state had the right in the manuscripts and in the plates, and the defendant did wrong in using them without the consent of the state, and would be liable under suitable allegations for such injury as the state suffered by reason thereof. The contract between the plaintiff and the state was of such a nature that the agreement on the part of defendant not to use the plates and manuscripts of the state for such purpose might be reasonably implied, because the defendant had no right to so use them." And, further: "Without doubt the law will imply an agreement on the part of the defendant not to use for its own private purposes the property of the state, entrusted to defendant's care to enable it to carry out the contract. * * * The state has a right to control the use of its own property, and, when by contract it places its property in the hands of its employees for a special purpose, the law, in the absence of anything in the contract to the contrary, will imply an agreement that the property shall be used only for that purpose." I further concur in so far as the opinion holds that the fact that the defendant entered into the contract with the state in nowise deprived it of the right which it had, in common with every other citizen, to procure in the ordinary manner copies of the opinions of the supreme court, to arrange, index, correct the proof,

and otherwise prepare them for publication, and to print and publish them, since there is no private ownership in the literary matter of the opinions themselves.   In fact, the only difference of opinion there seems to be between the majority of the court and myself is with reference to the remedy; their idea being that, by the violation of the implied contract, the defendant would become liable to the state only for the value of the unauthorized use of the state's materials and also for any injury done to the plates, while my view is that the legal remedy of damages, under all the circumstances of the case, is inadequate, and an equitable remedy necessary.   Mr. Pomeroy says: "Where the agreement stipulates that certain acts shall not be done, an injunction preventing the commission of those acts is evidently the only mode of enforcement; but the remedy of an injunction is not confined to contracts whose stipulations are negative; it often extends to those which are affirmative in their provisions, where the affirmative stipulation implies or includes a negative.   The universal test of the jurisdiction, admitted alike by the courts of England and of the United States, is the inadequacy of the legal remedy of damages in the class of contracts to which the particular instance belongs."   4 Pomeroy, Equity Jurisprudence (3d ed.), sec. 1341.   See, also, 5 Pomeroy, Equity Jurisprudence, Equitable Remedies, sec. 270, and note 2.   The rule is that, where there is a continuing breach of a negative covenant in a contract, and where an injunction against its violation will do justice and equity between the parties by compelling the defendant to carry out his contract according to the intention of the parties, or to keep him from reaping any profit or benefits from the breach of it, and where the remedy at law is not adequate, a court of equity will restrain the defendant from such a breach.  *Western Union Telegraph Co. v. Union P. R. Co.,* 1 McCr. (U. S. C. C.) 558; *Singer S. M. Co. v. Union B. H. & E. Co.,* 1 Holmes (U. S.), 253; *Chicago & A. R. Co. v. New York, L. E. & W. R. Co.,*

52

24 Fed. 516; *New York Bank Note Co. v. Hamilton Bank Note, E. & P. Co.*, 31 N. Y. Supp. 1060; *Saltus v. Belford Co.*, 133 N. Y. 499; *Myers v. Steel Machine Co.*, 67 N. J. Eq. 300, 57 Atl. 1080; 2 Beach, Modern Equity Jurisprudence, secs. 769, 770. The question involved in this case is not one of copyright or of literary property, but is one of contract and the proper remedy for a breach thereof, and this is why I think much of my brother Sedgwick's opinion is not germane to the question involved.

From the nature of the contract it will be observed that the damages which may flow from its breach are almost impossible of ascertainment. They may continue for a long period of years by the defendant's glutting the market with the reports which it is alleged it printed in violation of its contract, and thus deprive the state of the opportunity to reimburse itself for the money which it has paid for the printing of the books. The difficulty of ascertaining or recovering any specific damages furnishes a foundation for the interposition of a court of equity. Can it be questioned that, if the defendant was still in possession of these plates and manuscripts, and was using and threatening to use them in printing copies of the reports for its own use with the intention of selling them at reduced prices, it could not be enjoined? If it can be enjoined from using these plates, and from using the editorial labors paid for by the state in the preparation of indexes and the arrangement of manuscripts in violation of the contract, why should it not be enjoined from selling the unauthorized copies and thus profiting by its breach of the contract?

To sum up, the contract implied by its terms a negative covenant or restriction that the defendant would not use the property and material of the state, furnished it for the purpose of executing the contract, in such a manner as to defeat the object of the agreement and against the interest of the state. It made a breach of this implied agreement. The ordinary remedies provided by a legal action are clearly inadequate and, hence, a court of equity

should enjoin any further violation of the implied contract. See Bispham, Principles of Equity (6th ed.), secs. 461-464.

Of course, this discussion has proceeded upon the assumption that the allegations of the petition are true. What the proof may show, if issues are made up, we cannot foresee.

In my opinion the petition states a cause of action in equity to enjoin a breach of contract, and the demurrer should be overruled.

The following opinion on motion for leave to file amended petition was filed March 7, 1907. *Motion overruled:*

**Judgments, Vacating After Term.** The provisions of sections 602-609 of the code apply to original actions in the supreme court. The court therefore has no power or jurisdiction to set aside a judgment and allow the amendment of a petition, in its discretion, after the final adjournment of the term at which the judgment was rendered.

LETTON, J.

Application has been made during the present term of the court to file an amended petition in this case. A final judgment of dismissal, upon the demurrer to the petition being sustained, was entered at the September, 1906, term, since the plaintiff had formally announced that it would stand on its pleadings. The defendant contends that, since that term adjourned without further proceedings, the judgment entered was a final disposition of the case.

The action was brought under the original jurisdiction of this court, which is concurrent with that of the district court in like actions. Ordinarily a judgment of the district court, after the adjournment of the term at which it was rendered, becomes final. The power of the district court to vacate or modify its judgments, after the expiration of the term at which such judgments or orders are

made, is controlled by the provisions of sections 602-609 of the code. In *Huntington & McIntyre v. Finch,* 3 Ohio St. 445, it is said: "The court of common pleas has ample control over its own orders and judgments during the term at which they are rendered, and the power to vacate or modify them in its discretion. But this discretion ends with the term, and no such discretion exists at a subsequent term of the court." This rule has been repeatedly upheld in this state with reference to the powers of the district court. *Smith v. Pinney,* 2 Neb. 139; *McBrien v. Riley,* 38 Neb. 561; *Ganzer v. Schiffbauer,* 40 Neb. 633; *Schuyler B. & L. Ass'n v. Fulmer,* 61 Neb. 68; *Sherman County v. Nichols,* 65 Neb. 250. Section 610 of the code provides as follows: "The provisions of this title subsequent to section 601 shall apply to the supreme court and probate court, so far as the same may be applicable to the judgments or final orders of such courts." These provisions of the statute place it beyond the power of the court in an original cause at a subsequent term to set aside a judgment and permit an amendment of a petition, except in the manner and for the reasons prescribed in section 602.

Independent of these provisions, we are of the opinion that under the statutes we have no power to allow the amendment at this time. A discussion of the rules relative to original actions in the supreme court is to be found in *In re Petition of Attorney General,* 40 Neb. 402, and the conclusion is there reached that, since section 2 of the code provides there shall be but one form of action, and in section 903 it is provided that where the statute gives an action, but does not describe the mode of proceeding therein, the action shall be held to be the civil action of this code, therefore, original cases in this court must be governed by the rules of the code. If this action had been brought in the district court the right of the court in its discretion to set aside the judgment and to allow the plaintiff to amend its petition would expire with the term. As we have seen, both by the special provisions of section 610

and by the general provisions of the code, this court is governed as to judgments in original actions by the rules pertaining to judgments in the district court, and, since if the judgment had been rendered in the district court its power to set the judgment aside would have ended with the term, so that of this court ended with the adjournment of the September, 1906, term, and we have now no power or jurisdiction to allow the amendment.

Leave to file an amended petition is therefore

DENIED.