STUART SCHEPERS ET AL., APPELLEES, v. MARVIN LAUTENSCHLAGER ET AL., APPELLANTS.

112 N.W. 2d 767

Filed January 5, 1962. No. 35061.

Robert H. Petersen and John A. Wagoner, for appellants.

Andrew J. McMullen and Dier & Barton, for appellees.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is an action brought by Stuart and Adelia Schepers, plaintiffs, against Marvin Lautenschlager and William Lautenschlager, defendants, in the district court for Hall County, to recover $9,200, including $8,000 alleged profit on land sold by the defendants to Dr. Howard Yost, and $1,200 commission paid to defendant Marvin Lautenschlager. The trial court rendered judgment in the sum of $8,000 in favor of the plaintiffs and against the defendants, with interest at 6 percent per annum from February 2, 1961, and in favor of the plaintiffs in the sum of $1,200 with interest at 6 percent per annum from August 27, 1959, from the defendant Marvin Lautenschlager. The defendants filed a motion for judgment notwithstanding the verdict, or in the alternative for a new trial. The trial court overruled the defendants' motion, and defendants perfected appeal to this court.

The plaintiffs' second amended petition alleged in substance that the plaintiffs, prior to August 22, 1959, owned a quarter section of land in Merrick County; that the plaintiffs entered into a real estate listing contract with Marvin Lautenschlager, a real estate broker, for the sale of such land; and that upon the execution of the brokerage contract the plaintiffs orally instructed the defendant Marvin Lautenschlager to secure the best price he could for the property, but under no circumstances to take less than $150 an acre. The plaintiffs further alleged that the action of the defendant Marvin Lautenschlager, while acting legally as an agent of the plaintiffs, was in fraud and deceit, and in disregard of his duty to the plaintiffs as follows: (1) That he failed to inform his principals of their probability to secure the sale of their land for the price of $200 an acre to Dr. Howard Yost, if Dr. Yost could establish for himself the

presence of water in irrigable amounts underneath the land, and favorable soil check, which said presence of water was known to the defendant Marvin Lautenschlager at the time; (2) that defendant Marvin Lautenschlager, in concert with the defendant William Lautenschlager, conspired to secure title to the premises without divulging to the plaintiffs the prospective higher price from Dr. Yost, and with the intention to secure for themselves, or either of them, the increased price in violation of their duties; (3) that Marvin Lautenschlager made representations as to the best price he could possibly get for the sale of the farm, knowing them to be false, and did, by not divulging the whole truth to his principals, the plaintiffs, intend to deceive them; (4) that the plaintiffs relied upon the representations made by Marvin Lautenschlager that $150 was the best price he could get, and as a result thereof executed a purported deed conveying the premises for $8,000 less than could have been secured by the plaintiffs had they known the truth from their agent, Marvin Lautenschlager, about such opportunity with Dr. Yost; and (5) that had the plaintiffs been informed that Dr. Yost had expressed an interest in buying their land at $200 an acre, and the facts surrounding the negotiations, they would not have agreed to sell the land for $150 an acre.

The second amended petition further alleged that as a result of the reliance upon the representation, and the failure to divulge the whole truth, plaintiffs were damaged in the sum of $8,000, which was the difference between the price that could have been secured by an agent in the proper conduct of his legal and moral responsibilities, and the price that was secured for the plaintiffs, together with a commission in the amount of $1,200 which was not due and owing to the defendant Marvin Lautenschlager because of his breach of legal and moral duties to his principals, the plaintiffs

herein. The prayer of the plaintiffs' petition was for $9,200 and equitable relief.

The defendants each filed separate answers denying all allegations of the plaintiffs' second amended petition.

For convenience we will refer to Stuart Schepers as Stuart, to Marvin Lautenschlager as Marvin, to William Lautenschlager as William, at times to Stuart and Adelia Schepers as plaintiffs, to Marvin Lautenschlager and William Lautenschlager as defendants, and to Dr. Howard Yost as Yost.

The record discloses that the plaintiffs live in Hall County and owned 160 acres of land in Merrick County which Stuart purchased in his own name in March 1941. Stuart testified that on August 10, 1959, the plaintiffs entered into a farm listing contract with Marvin as their agent to sell the land in Merrick County for $150 an acre; and that by the contract Marvin had the exclusive right to sell the farm until January 1, 1959, which must have meant January 1, 1960. The agreement described the land and the terms of sale. Stuart further testified that Marvin represented to Stuart that he was a real estate broker and that he had sold land in the vicinity of Stuart's farm and would try to sell the plaintiffs' land for as much as he could get for it. Stuart further testified that the next time he saw Marvin was between 7 and 8 p.m., the evening of August 22, 1959, at his home; and that at that time Marvin told Stuart that he had the farm sold. On August 22, 1959, the plaintiffs signed the purchase agreement prepared by Marvin. This purchase agreement sets forth the price of $24,000 for the plaintiffs' farm, with a $2,400 down payment and the balance at the time of settlement with delivery of the deed and abstract. The purchaser was William, who was Marvin's uncle. Marvin said nothing about himself being the buyer, and he never mentioned Yost. Stuart further testified that the next time he saw Marvin was when he delivered the abstract to Marvin, and later he saw Marvin when he brought

the check for the sale of the farm and the plaintiffs signed the deed. This deed shows that the plaintiffs were the grantors conveying the farm in Merrick County to William and Marvin. The deed was signed on August 28, 1959, with Marvin as a witness and also as notary taking the acknowledgment of the plaintiffs. This deed was recorded August 29, 1959. Stuart further testified that he looked at the deed which showed William as the grantee, and Marvin's name was not on the deed at that time. He further testified that he never had any personal contact with Yost prior to August 31, 1959; that he first learned Yost was interested in this farm about a month later when Yost called him on the telephone; and that Marvin never told him of any attempt to sell the farm to Yost.

On cross-examination Stuart testified that he was familiar with irrigation around Shelton; that he agreed upon the figure of $150 an acre as the lowest price; that the listing agreement provided for $150 an acre; and that he did indicate to Marvin that he was pleased about the sale of the farm, and talked to Marvin about some land in Fillmore County which he might sell.

On redirect examination Stuart testified that the commission of $1,200 to Marvin was taken out of the purchase price of the farm.

Yost testified that he was contacted with reference to the plaintiffs' farm in Merrick County by Marvin on either Tuesday, Wednesday, or Thursday prior to August 22, 1959, which was Saturday; that he went out to the farm between 10 and 11 a.m., on Saturday, August 22, 1959; that Marvin came out and they drove around the farm in Marvin's car and looked at the wells; that Marvin had little information about the wells, except that they were shallow; and that Marvin told him that the plaintiffs owned the farm and they wanted $200 an acre for it and Marvin's uncle might be interested in the farm but if Yost wanted it they would let him have it. Yost further testified that he wanted to get some

more information, so he and Marvin terminated the conversation with the understanding that Yost would get some more information about the soil, and possibly the capacity of the pumps and the water potential before making a commitment. A man by the name of Moates was recommended to him as knowing about irrigation and the management of farms. This witness called Moates the next Tuesday morning and made an appointment to meet him at the farm. They went over the farm to see what would be needed. Moates suggested that a test well be put down, provided the owners' permission could be obtained. Yost further testified that he did not know the plaintiffs, and the only contact he had was with Marvin. He asked for permission to put down a test well and it was granted by Marvin, and from then on Moates took over. On Saturday, August 29, 1959, Moates called Yost and said they had a very promising test well, one of the best in the area, and Yost told Moates he thought he would buy the farm. Yost further testified that he immediately told Marvin he would buy the farm and asked Marvin to bring the necessary papers for him to sign and he would give Marvin a check for what was required to complete the sale. Marvin came between 8 and 9 a.m., the following Monday morning. A uniform purchase agreement, wherein this witness agreed to purchase the farm for $32,000, with $3,200 down and the balance on delivery of the deed and abstract with possession, was signed on August 31, 1959. This witness further testified that he thought the plaintiffs owned the farm and that he was buying it from them. Marvin said that his uncle William wanted it and bought it. Yost further testified that on August 22, 1959, Marvin did not tell this witness that he had any interest in the farm; and that when Marvin came out to the farm on that day this witness told Marvin he would like to have time to make the necessary investigation to satisfy himself as to whether or not he wanted to buy the farm.

On cross-examination Yost testified that he definitely accepted the offer to purchase the farm on August 29, 1959, and that his purchase of the farm was contingent upon the water supply under the land. On redirect examination this witness testified that he told Marvin on August 22, 1959, he intended to investigate the farm with the idea of purchasing it.

Marvin testified that he had lived in Hall County since 1951, and became a licensed real estate broker on October 12, 1955; that he became acquainted with Stuart on July 30 or 31, 1959; that he had heard Stuart had a farm that might be for sale so he contacted Stuart and talked about the farm being for sale; that he contacted Stuart on August 10, 1959, to ascertain if Stuart would be interested in listing his farm in Merrick County for sale; and that he wrote up the listing agreement which was signed by the plaintiffs. Stuart said he would like to have $150 an acre for the farm. Marvin further testified that on Monday, August 17, 1959, he called his uncle William and told him about the farm being for sale; that he took his uncle out to the farm and drove around it; and that he quoted a price of $200 an acre to his uncle. On or about August 18, 1959, Marvin called Yost and told him a farm was for sale in the general area where he had shown Yost a farm a year previous. An appointment was made with Yost for 10:30 a.m., Saturday, August 22, 1959. Marvin testified further that he drove to Palmer on Friday morning, August 21, and contacted his uncle William to try and sell him the farm. William said he would give $150 an acre for the farm as that was all it was worth to him. Marvin wrote up an agreement and returned to Palmer that afternoon. The agreement was a uniform purchase agreement dated August 21, 1959, wherein William agreed to purchase the farm for $24,000, $2,400 down and the balance at the time of settlement with delivery of the deed and abstract. The following morning, August 22, 1959, Marvin drove out to the plaintiffs' farm and met Yost there. Yost in-

spected the farm, they observed the irrigation wells, and Marvin quoted a price of $200 an acre for the farm. Yost said he would have to know more about the farm before he could show any interest in it, and that he would have to know more about the soil and the water supply. Yost at that time did mention the possibility of a test well, but no arrangement was made with this witness relating to a test well. Marvin told Yost that his uncle William was interested in the farm. On August 22, 1959, Marvin drove to the plaintiffs' place with the offer agreement he had signed with his uncle William to get the acceptance of the offer from the plaintiffs. The plaintiffs accepted the purchase agreement August 22, 1959, and at that time Marvin told the plaintiffs that his uncle William was buying the farm. There was some discussion about future business relations between Stuart and Marvin. On August 24, 1959, Marvin drove to Palmer and took the copy of the acceptance offer to his uncle. The title opinion was completed the morning of August 27, 1959. Marvin drove to Palmer to tell his uncle that the opinion with reference to the plaintiffs' farm was approved. This witness further testified that his uncle asked him to manage the farm and said that his uncle would give him an interest in it, let him put his name on the deed as co-owner with his uncle, and told him to draw the deed. On August 28, 1959, this witness typed up the closing statements and took the deed to Shelton, to the home of the plaintiffs, to complete the deal. Marvin testified that the names appearing on the deed were on it at the time he presented it to the plaintiffs. On Thursday morning, August 27, 1959, Yost called Marvin and wanted to know if Marvin had any objection to his running a test well on the plaintiffs' farm. Marvin testified that he did not recall telling Yost anything about his uncle William buying the farm under a purchase agreement. Marvin further testified that he contacted his uncle William on August 29, 1959, and William decided to sell the

farm to Yost. A purchase agreement was drawn, and on August 31, 1959, Yost signed the agreement. Marvin further testified that on August 22, 1959, he did not tell Stuart that Yost had seen the farm and had inspected it because, unless there was a prospect who had shown an interest in the farm, it would be unnecessary to relate to the seller the persons to whom the farm had been shown; and that Yost left him indicating that he, Yost, had little interest in the farm and Marvin did not consider Yost a prospect to purchase the farm.

On cross-examination Marvin testified that he did not tell Yost that he had a signed contract by his uncle William for the sale of the farm for $150 an acre; that Stuart never said anything about getting more than $150 an acre for the farm; that Stuart was happy with the deal; that he saw the test well on the farm on Saturday, August 29, 1959; and that when he left the indications were that it would be a good well.

William Lautenschlager testified that he was in the implement business and lived at Palmer, Nebraska; that on August 17, 1959, he had business relations with Marvin concerning the plaintiffs' farm in Merrick County; that Marvin quoted a price of $200 an acre for the farm; that on August 20, 1959, he drove to the plaintiffs' farm and looked it over; that on August 21, 1959, he again had business relations with Marvin concerning the sale of the farm; and that he told Marvin he would make an offer of $150 an acre for the farm. This offer was signed on August 21, 1959, at Palmer. He further testified that he told Marvin on August 24, 1959, to draw up a deed and to put his name on it, and that he would give Marvin a one-sixth interest in the farm and Marvin was to manage the farm. This witness further testified that he did not know that Yost had visited the farm. On August 29, 1959, Marvin contacted this witness and told him that Yost was interested in purchasing the farm, and he agreed to sell the farm to Yost; and that on

August 31, 1959, he signed the contract concerning the sale of the farm to Yost.

The deposition of Edward Jochim was read into evidence. He testified that he first knew Marvin in June 1958, when he bought a farm from Marvin, and he continued to have business relations with Marvin; that he inspected the plaintiffs' farm with Marvin; that he was advised that he was to be a tenant of William; that Marvin was interested in the management of the farm; that the terms of the tenancy were not discussed; and that the farm was sold and the new owner had a farm manager. On cross-examination this witness testified that he went out to look at the farm prior to August 30, 1959; and that there was an oral agreement between this witness and Marvin that this witness was going to be the tenant for the following year.

The defendants assign as error that the trial court erred in rendering judgment against the defendants Marvin and William Lautenschlager in the amount of $8,000 because there was insufficient evidence to support the judgment; that the trial court erred in rendering judgment in favor of the plaintiffs in the sum of $1,200 against the defendant Marvin because of insufficient evidence to support the judgment; and that the trial court erred in overruling the defendants' motion for judgment notwithstanding the findings and verdict, or in the alternative for a new trial due to insufficient evidence against either of the defendants.

This is an equity case for trial de novo.

There are well-established rules of law that are applicable to the instant case.

"The duties and liabilities of a broker to his employer are essentially those which an agent owes to his principal. A broker owes to his employer the duty of good faith and loyalty, and is required to use such skill as is necessary to accomplish the object of his employment. * * * It is also his duty to give his client the fullest information concerning his transactions and dealings in

relation to the property with reference to which he is employed, * * *." 8 Am. Jur., Brokers, § 85, p. 1035.

"A broker is a fiduciary required to exercise fidelity and good faith toward his principal in all matters within the scope of his employment. * * * This requirement not only forbids conduct on the part of the broker which is fraudulent or adverse to his client's interests, but also imposes upon him the positive duty of communicating all information he may possess or acquire which is, or may be, material to his employer's advantage." 8 Am. Jur., Brokers, § 86, p. 1035.

"A broker cannot, without violating his general duty of good faith, act for persons having interests adverse to those of his employer, unless he acts with the consent of his employer given with full knowledge of the facts." 8 Am. Jur., Brokers, § 87, p. 1036.

"The rule requiring a broker to act with the utmost good faith towards his principal places him under a legal obligation to make a full, fair, and prompt disclosure to his employer of all facts within his knowledge which are or may be material to the matter in connection with which he is employed, which might affect his principal's rights and interests or influence his action in relation to the subject matter of the employment, or which in any way pertain to the discharge of the agency which the broker has undertaken. Thus, it is the duty of a broker who is employed to sell property at a specified price to inform his principal of the fact that the property has become of enhanced value since the time when it was placed in his hands for sale, or, upon hearing that a more advantageous sale or exchange can be made, the facts concerning which are unknown to the principal, to communicate the same to him before making the sale as expressly authorized. A neglect to do so renders him liable to his principal for whatever loss the latter may suffer as a consequence thereof." 8 Am. Jur., Brokers, § 89, p. 1038.

In Jansen v. Williams, 36 Neb. 869, 55 N. W. 279, 20

L. R. A. 207, this court said: "An agent is required to disclose to his principal all the information he has touching the subject-matter of the agency; and his relation to his principal forbids his becoming a purchaser thereof for his own benefit in any way without the full knowledge by the principal of this fact, and the principal's acquiescence therein with such knowledge .* * * A commission cannot be collected by the agent for his services as such if he has willfully disregarded, in a material respect, an obligation which the law devolves upon him by reason of his agency." The court went on to say, quoting from Mechem, Agency, § 455: " '*Fidelity in the agent* is what is aimed at, and as a means of securing it the law will not permit the agent to place himself in a situation in which he might be tempted by his own private interest to disregard that of his principal.' "

As said in Pearlman v. Snitzer, 112 Neb. 135, 198 N. W. 879: "The law imposes upon an agent the duty of disclosing to his principal every material fact known to him which is the subject of the agency. * * * Where an agent for the sale of real estate to another withholds from his principal material facts pertaining to the sale of the property, such conduct renders the contract voidable and the agent cannot recover any commission."

The doctrine is well settled that an agent cannot, either directly or indirectly, have an interest in the subject matter of the agency without the consent of his principal, freely given, after full knowledge of every matter known to the agent which might affect the principal. See 2 Am. Jur., Agency, § 253, p. 204. See, also, Nebraska Power Co. v. Koenig, 93 Neb. 68, 139 N. W. 839; James v. McNair, 164 Neb. 1, 81 N. W. 2d 813; Jansen v. Williams, *supra;* Northup v. Bathrick, 80 Neb. 36, 113 N. W. 808.

In 2 Am. Jur., Agency, § 269, p. 217, it is said: "In the exercise of good faith and diligence, it is the duty of the agent to use reasonable efforts to keep his principal informed of all facts which may come to the agent's

knowledge concerning the matters that have been intrusted to him which affect the principal's business, his rights, or his interests, or which he would desire to know, and which can be communicated without violating a superior duty owing to a third person. For example, if, after receiving instructions to sell property on certain specified terms or at a stipulated price, the agent learns that other and more advantageous terms or a better price can be obtained, he is under every legal as well as a moral obligation, to communicate the facts to the principal."

The evidence shows that William, after purchasing the land for $150 an acre, sold it within a few days to Yost for $200 an acre; and that William gave Marvin, his nephew and the agent of the plaintiffs, a one-sixth interest in the land and authorized the insertion of Marvin's name as grantee in the deed. From this, together with the relationship of William to Marvin, the trier of facts could properly find knowledge on the part of William that Marvin was acting adversely and fraudulently as to the best interests of his principal.

In Ericson v. Nebraska-Iowa Farm Investment Co., 134 Neb. 391, 278 N. W. 841, this court said: "An agent or other fiduciary who deals with the subject-matter of the agency so as to make a profit for himself will be held to account in equity as trustee for all profits and advantages acquired by him in such dealings. * * * An agent who fails to disclose to his principal every material fact in the transaction which is the subject-matter of the agency is guilty of fraud and bad faith, and may not retain anything acquired by him either in the performance or violation of his agency. * * * All persons who knowingly aid or participate in committing a breach of trust will be held responsible for the resulting loss, and will be held accountable by personal judgment for the value of the property so converted." See, also, Gesselman v. Phillips, 110 Neb. 416, 193 N. W. 750; Pearlman v. Snitzer, *supra;* Rockford Watch Co. v. Manifold, 36

Neb. 801, 55 N. W. 236; Jansen v. Williams, *supra;* State v. State Journal Co., 77 Neb. 752, 110 N. W. 763; Missouri Valley Trust Co. v. Nelson, 104 Neb. 499, 177 N. W. 835; Masonic Building Corp. v. Carlsen, 128 Neb. 108, 258 N. W. 44; Federal Trust Co. v. Baxter, 128 Neb. 1, 257 N. W. 368; Ashby v. Peters, 128 Neb. 338, 258 N. W. 639, 99 A. L. R. 843.

From the facts adduced from the record, William should not have been permitted, in equity, to retain any benefit from his purchase and sale, as he participated in the breach of duty by the agent Marvin, or at least knew that Marvin was breaching his duty to the plaintiffs at the time he, William, purchased the farm.

The record discloses that Marvin, as a broker, had shown real estate in the area in which the plaintiffs' farm was located to Yost a year previous to showing Yost the plaintiffs' farm involved in the instant case. Obviously he was acquainted, as a real estate broker, with the water situation in that area, and knew the type of land therein and its value.

The record discloses that Marvin violated his duty as a broker, as shown by the evidence and the authorities heretofore set forth.

There is another rule that is applicable to this case, that is, where the evidence is in irreconcilable conflict this court will consider the trial court's observation of witnesses and their manner of testifying, and also that the trial court must have accepted one version rather than the opposite. See Crable v. Great Western Sugar Co., 166 Neb. 795, 90 N. W. 2d 805.

In consideration of the facts and authorities heretofore cited, the judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.

SIMMONS, C. J., participating on briefs.

SPENCER, J., dissenting.

I respectfully dissent from the majority opinion insofar as it affirms the judgment as to William Lauten-

schlager. I am unable to find any evidence in the record to justify this court in holding that William Lautenschlager knew that his nephew, Marvin Lautenschlager, was breaching his duty to the plaintiffs at the time William signed the purchase agreement.

Marvin first talked to William Lautenschlager about buying the farm on August 17, 1959, quoting a price of $200 an acre. William Lautenschlager inspected the farm on August 20, 1959, with Marvin and an insurance representative who said he would loan $16,000 on it. On August 21, 1959, Marvin came to see William at Palmer, Nebraska, urging him to purchase the farm. At that time William told Marvin that he would make an offer of $150 an acre. Marvin went back to Grand Island, typed up the offer, and brought it back to Palmer, Nebraska, where it was signed. It was accepted by the plaintiffs the next day. Doctor Yost's testimony is that he did not look at the farm until August 22, 1959, and that at that time did no more than indicate he intended to inspect it further before he would make a commitment.

The evidence is undisputed that William Lautenschlager did not know that Doctor Yost was interested in the farm or that Doctor Yost had even been contacted when he made his offer. It was a full week after his offer had actually been accepted by the plaintiffs before he learned of Doctor Yost's interest. The effect of the majority opinion is to shift the burden of proof from the plaintiffs to the defendant, William Lautenschlager, with which I cannot agree.

Judge Boslaugh authorizes me to say that he joins in this dissent.