THOMAS C. AMES, APPELLEE, v. SANITARY DISTRICT NO. 1 OF LANCASTER COUNTY ET AL., APPELLANTS.

2 N. W. (2d) 530

FILED FEBRUARY 6, 1942. No. 31250.

*Baylor, Tou Velle & Healey*, for appellants.

*T. R. P. Stocker* and *Bruce Fullerton*, contra.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

EBERLY, J.

This is a proceeding under the workmen's compensation law. Comp. St. 1929, secs. 48-101 to 48-161, inclusive. Thomas C. Ames is plaintiff; Sanitary District Number One of Lancaster county, Nebraska, and the Continental Cas-

ualty Company, as its insurance carrier, are the defendants. In his petition the plaintiff states, in part: "That while in the employ of Sanitary District Number One of Lancaster county, Nebraska, on or about the 7th day of September, 1939, the above named plaintiff received personal injuries arising out of and in the course of employment by the above named defendant, as chemist. * * * The nature and extent of injury consists of the total loss of the sight of his left eye * * * and that said injury is permanent." The defendants by their pleading put in issue the allegations of plaintiff's petition. On an appeal from a decision of a one-judge compensation court in favor of plaintiff, there was a trial *de novo* in the district court for Lancaster county, wherein there was a finding for plaintiff and against defendants, and in substance the further determination that on September 7, 1939, "while in the course of his employment a foreign substance accidentally struck the eye of the plaintiff resulting in injury and laceration thereto and permanently impairing the vision of his left eye;" and that "the employee was a chemist for said Sanitary District Number 1 of Lancaster county, Nebraska, was of the age of sixty-five (65) years and said injury so received by the employee resulted in permanent industrial blindness to his left eye due to the accident of September 7, 1939," which entitled him to $15 a week for a period of 125 weeks, for which amount judgment was duly entered. On this appeal and trial *de novo* the defendants challenge the award decreed by the district court both as to being contrary to the evidence and also to the law.

Section 48-121, Comp. St. 1929, as amended, provides, in part: "The following schedule of compensation is hereby established for injuries resulting in disability: * * * (3) For disability resulting from permanent injury of the following classes, the compensation shall be in addition to amount paid for temporary disability; * * * For the loss of an eye, sixty-six and two-thirds per centum of the daily wages during one hundred and twenty-five weeks. * * * Permanent total loss of the use of a * * * or eye shall be

considered as the equivalent of the loss of such * * * or eye. In all cases involving a permanent partial loss of the use or function of any of the members mentioned in subdivision 3 of section 3662 (48-121) the compensation shall bear such relation to the amounts named in said subdivision 3 of section 3662 as the disabilities bear to those produced by the injuries named therein."

It is to be observed that our statutes nowhere define the characteristics and powers of the normal eye. The obvious intent thereof is to compensate and indemnify the owner of an eye capable of industrial use and injured in industry to the full extent of his industrial loss occasioned thereby. This seems in accord with the better reasoned cases.

Thus, in *Hobertis v. Columbia Shirt Co.*, 186 App. Div. 397, 173 N. Y. Supp. 606, a case involving facts which disclosed that the claimant lost the use of an eye, and that she had at all times been nearsighted, having not to exceed 50 per cent. vision, and where appellant's claim was that such claimant should only be allowed for the loss of one-half vision, the New York court answered the appellant's contention thus: "The statute does not provide that the loss of the use of an eye shall be compensated by an award based upon the amount of vision which existed previous to the accident, whether it be 50 per cent. or 80 per cent. of vision lost. It awards specific compensation for the loss of an eye. It is matter of common knowledge that very few persons have complete and perfect vision. The claimant was working with defective vision. So far as appears her work was entirely satisfactory to her employer, at least so far as the wages she received. The wages received by her must be considered her wage-earning capacity with defective vision. She lost the use of her eye, such as she had, and is entitled to compensation therefor based upon her earning capacity."

In the instant case the conclusion is that, if claimant Ames has lost the industrial use of his eye by accident arising out of, and in the course of, his employment, he is entitled to the statutory indemnity therefor, to be measured by his

weekly wage, without reference to the question of normal sight.

This record presents a question of fact to be determined on conflicting evidence. This proof, according to the testimony of the plaintiff, includes the following: On September 7, 1939, he was in the employ of the defendant Sanitary District. He had occupied that relation for 17 years. As such employee he performed the duties of chemist, pump operator of the sewage disposal plant of the defendant, and in addition performed practically all of the mechanical work which was required in its operation. He was born on July 9, 1876. His salary was $135 a month. His duties required the daily making of certain chemical tests and for that purpose as a daily routine he would select samples of sewage and make a chemical examination thereof. In connection with this test very fine iron filings were employed. These filings were piled on a platform near the building of the disposal plant. September 7, 1939, was an exceedingly windy day. On that day he secured the sewage samples for examination, and as he approached this pile of iron filings to secure a quantity thereof for the purpose of completing the test, the heavy wind then prevailing blew iron filings as a cloud of dust into his left eye. He, however, finished securing the necessary materials for making this chemical test, though he "couldn't see anything for, oh, till noon." One of the men employed at this plant then examined the injured eye and informed plaintiff that "that has got something in it." The "boss," plaintiff's superior, was away from the plant and, not returning, about 3 o'clock in the afternoon plaintiff went to Dr. Paul Black of Lincoln, Nebraska, for treatment. It seems Dr. Black was the doctor employed by the defendant district. At least it appears the doctor's charges for this service were paid by it. Dr. Black put drops in plaintiff's eye to kill the pain; then examined the left eye through a strong glass. The eye was "washed out" and bandaged and claimant was informed that there was a bad "scar" or injury in the sight of the eye. The doctor depicted the

injury to him by a drawing made at the time. During the
course of treatment that followed, this doctor prescribed a
new set of glasses. Subsequent to September 7, 1939,
claimant states he could not read anything with his left
eye, "that is, figures or close stuff"; he "can see objects but
can't distinguish what they are." Objects look blurred like
something was over it. He is not now able to do ordinary
reading with the right eye covered and the left eye open,
a power which he previously possessed. Dr. Black gave
him new glasses before he was discharged because the
vision in the left eye did not come up as he thought it
should.

On being recalled by the defendant for cross-examination,
the plaintiff testified that he had never had an operation on
either eye, nor any ulcer trouble in connection therewith.
Further, that Dr. Ballard at one time removed an enlarge-
ment or growth on the outside of the eyelid.

The record discloses a stipulation that, if Dr. Paul Black
were called as a witness on behalf of plaintiff, with reference
to the fact of accident to the left eye of claimant, he
would testify that plaintiff "injured his left eye September
7, 1939, by getting something in it. It was a rather deep
laceration of the cornea, part of which was in the pupillary
area. Healing eventually occurred but a certain amount of
scarring remained."

Another witness appearing on behalf of plaintiff as an
eye, ear and throat specialist, who has practiced as such
since 1919 and whose qualifications as an expert witness
are unchallenged, testified in substance as follows: "Q.
Had he ever been a patient of yours before? A. Yes;
I treated him for tear duct seepage of his eyes, I think it
was in 1938 and 1939. Q. Now you may give us, if you
will, what observations you made as a result of your
examination the first time when you examined him with
reference to this injury. A. Well, on February 22, 1940,
the examination was something like this. The right eye,
there is nothing abnormal about the right eye, the vision
being 20/30 without glasses and 20/20 or normal with

glasses. In the left eye there is a scar presenting the appearance of a corneal scar, several months standing, reaching the entire length of the cornea from left to right about midway from the upper and lower border of the cornea. The scar is deep and has all but penetrated the entire thickness of the corneal structure. The cut has been filled in with scar tissue and is not likely to become painful or inflammed. Vision in the left eye is, without glasses, 20/200. There is no improvement with glasses. This means Mr. Ames reads at 20 feet letters that he should read at 200 feet. He is not able to read any ordinary type at reading distance either with or without glasses. There is a possibility that the lens is injured which may in time result in cataract. It seems that the other eye is normal. There is no possibility that the vision in this eye will ever improve. Q. Now when you speak of filling in with scar tissue over the cornea or in the cornea of the eye, is scar tissue such a material as there will be vision through it as a dark lens of the eye? A. I don't understand. Q. The scar tissue you mentioned filling in in the eye where a cut was, what is the possibility of seeing through that scar tissue? A. You mean in general terms? Q. Yes, and then in particular as applies to Mr. Ames. Both in general and as you have found it in his case. A. Of course the vision is bound to be obstructed through the scar because of the fact that when nature fills in the scar tissue it is not the same tissue as was injured and she does that all over the body. Wherever scar tissue is filled in, if it is in the kidney it is not functioning tissue, it is just as makeshift. If it is in the heart it is the same thing and in the eye it is the same thing, so, of course, they cannot see through the scar nothing like they should with a normal cornea. * * * Q. What is the effect so far as the individual is concerned? Is it a blurring effect? Is that what it makes? A. Yes, bound to have a blurring effect. * * * Q. I want to ask you another question about the scar. I think I was present at one examination where you showed how you could see the scar on the eye. A.

Yes, sir.   Q. What instrument were you using at that time?   Would you describe that to us?   A. It is what we call a opthalmoscope. * * * Q. Now, Doctor, I want you to describe for us whether or not this scar is connected with the outside in any way or whether that scar tissue is separate pieces there?   A. They are not all connected; no.   Q. Are they connected with what is sometimes called the arcus senilis?   A. No.   Q. Does Mr. Ames have an arcus senilis in his left eye?   A. Yes, most men of his age.   Q. About what age does it come?   A. Fifty, even earlier than that, but most common after the fifth decade.   Q. Tell us what an arcus senilis is.   A. It is a deposit of fat granules around the periphery of the eye, fat granules and hylin deposits and sometimes a little lime deposits.   Q. Now in this case are these pieces of scar tissue you have described as being on this cornea, are they directly connected with the arcus senilis in Mr. Ames' left eye?   A. No.   Q. Do you have an opinion in this case whether or not they are an outgrowth or part of the arcus senilis or could they be accounted for by reason of an injury and trauma such as Mr. Ames described to you at the time of his examination? A. They are not an arcus senilis.   Q. Are they such a scar tissue as would develop from some type of laceration in the eye there?   A. Yes.   Q. Can you tell, as a specialist, whether or not with those pieces of scar tissue in the location where they are whether they would of necessity impede his vision, interfere with it perhaps I should say? A. Oh, yes, of course they would. * * * Q. And the effect of that is it blurs the object you are trying to see?   A. It blurs and interferes with what we call binocular vision and fusion.   It interferes with deep perspection, what we call stereoscopic vision and sometimes interferes with distinguishing of colors and gives what we call a diffusion of light. * * *   Q. What I mean is this, Doctor, if a man comes into your office and claims he has had some dirt or particles go into his eye and you examine it and find a laceration there, would you then be in position to tell whether that laceration or that condition was the result

of a trauma or the result of some old previous ulcer? A. Yes, sir. Q. What evidence would there be as to its being the result of an ulcer and what evidence would there be of a trauma or laceration? A. There would be a difference in the appearance of the tissue. A fresh wound has quite a different appearance than an old one or a scar tissue. * * * Q. Would you have any difficulty yourself in ascertaining whether it was the result of a previous ulcer or present laceration or trauma? A. No."

Two medical witnesses testified in behalf of defendants as experts. One, Dr. Clarence R. Carlson, had examined plaintiff's eyes in March, 1939, prior to the accident and then again in December, 1939. This doctor gives a technical description as to the defects exhibited by the claimant's eyes. These are not in complete accord with the evidence given by other professional witnesses, however. The following testimony given by this witness represents his conclusions: "Q. Did you furnish him with glasses in March, 1939, with which he was able to read with his left eye? A. Yes; I did. Q. Was he able to do ordinary reading with that left eye? A. If it was not too small. Q. Would you say ordinary newspaper reading he could read with his left eye? A. Just about that, not any smaller than that. * * * Q. So far as your examination disclosed then from the ability to read ordinary newspaper with glasses in March, 1939, prior to the accident as compared to December, 1939, after the accident, he had changed from reading newspaper to not being able to read at all with glasses? A. That is right. * * * Q. And of course you took his word on every examination? A. Certainly, I had no reason to discount it. Q. And you fitted glasses on his statement? A. Yes. With the aid of the instrument, not his word alone. Q. You had the same instrument one time that you did the other, did you not? A. That is right."

The other medical witness presented on behalf of defendants has specialized in eye, ear, nose and throat since July, 1925, and his qualifications as an expert are likewise unchallenged. He examined the claimant on April 15,

1940, and on April 17, 1940, the results of which appear to be confirmed by an examination on December 17, 1940. This witness substantially disagrees with the conclusions testified to by plaintiff's witnesses both as to the facts and proper deductions to be made therefrom. He accepts as his working hypothesis that the accident as described by plaintiff's witnesses never occurred, and that the conditions that obtain in plaintiff's left eye are not the result of accident or trauma occasioned thereby, but are due wholly to the development of natural conditions. After detailing the examination made by him and his technical deductions therefrom, he states his conclusions as follows: "Q. Now as a result of the examinations which you made April 15th and April 17th of which you have just recited findings, tell us what conclusion you came to as to whether or not the man was suffering from a defective vision as the result of accident to which he referred as having occurred on September 29, 1939? A. My opinion of this situation, based on my examination, was that the defect of vision from which Mr. Ames is suffering is the result of two things, the chorioretinitis which he has in both eyes and the change in the structure of the cornea which is degenerative in type and in my opinion is not connected with trauma. Q. Now let's go to your later examination. When was it that you made that? A. The date of it was December 17, 1940." The witness then, on the basis that there has been no accidental injury to plaintiff's left eye, testified in clear contradiction to the statements of plaintiff and of the expert witnesses testifying for plaintiff. Obviously, both lines of this testimony cannot be true. It would seem that Dr. Black, whose testimony as stipulated is that he treated plaintiff's left eye on September 7, 1939, on the day of its injury, for a "rather deep laceration of the cornea, part of which was in the pupillary area," and whose integrity is not attacked, should be regarded as a witness amply corroborating plaintiff's testimony on that point. Further, that the testimony of plaintiff's experts who accepted as foundational the theory of accident, should pre-

vail over the proof presented by defendants' expert who testifies on the basis that the accident never occurred and that plaintiff's left eye now evidences no results of trauma. The defendants' expert witness on this question testifies as follows: "Q. Could you by either the slit lamp or otherwise,—If he had had a rather deep laceration of the cornea in the pupillary area, would that not leave a scar? A. Yes, in my opinion. Q. And you found no scar? A. I found no scar. Q. Therefore you deduct that he did not have this laceration that he claims he had? A. I am forced to conclude from my findings that no laceration was present. Q. And if Dr. Black had him within the day of the accident and he made such a report that he did receive such a laceration, a rather deep laceration in the eye, he must have been mistaken about the injury when he examined him, is that right? A. I think the answer to that is that the description of Dr. Black and the opinion which I might hold as to a certain injury might differ materially and in either case either of us might be right, that is true. Q. He would have a better opportunity to know of the laceration if he looked at it within a day of the injury, wouldn't he? A. Yes, of course. Q. And naturally such an opinion would be perhaps more authentic than making an examination at some later date? A. That would be true in the case of an injury."

The writer of this opinion is not inclined to attack the good faith of any of the expert witnesses in this case. The evidence of the plaintiff, a layman, is plain and simple, and, if believed, entitles him to a recovery. Further, the record furnishes corroborative evidence. True, the evidence is plainly conflicting and cannot be reconciled. In the consideration and evaluation of such testimony this court will consider the fact that the district court gave credence to the testimony of some witness or witnesses rather than the contradictory testimony of others. *Cunningham v. Armour & Co.,* 133 Neb. 598, 276 N. W. 393; *Shafer v. Beatrice State Bank,* 99 Neb. 317, 156 N. W. 632; *Greusel v. Payne,* 107 Neb. 84, 185 N. W. 336; *Donker v.*

*Central West Public Service Co.*, 134 Neb. 892, 280 N. W. 168; *Southern Surety Co. v. Parmely*, 121 Neb. 146, 236 N. W. 178.

From a careful consideration of all the evidence in the record, in the light of the fact that the district judge who heard this case *de novo* and observed the witnesses as they testified, from such proof rejected the theory of the defendants and accepted the theory of the occurrence of an accident, arising out of, and in the course of, plaintiff's employment, as the proximate cause which inflicted on plaintiff total permanent industrial blindness of his left eye, we arrive at the conclusion that the case was correctly decided by the trial judge and that his award is right and should be affirmed.

AFFIRMED.