THURSTON C. BOLEN, APPELLEE, V. P. B. BULLER, DOING BUSINESS AS P. B. BULLER COMPANY, ET AL., APPELLANTS.

9 N. W. (2d) 204

FILED APRIL 16, 1943. No. 31580.

*Fitzgerald, Tesar & Welch,* for appellants.

*Frost, Hammes & Nimtz, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

MESSMORE, J.

This is a proceeding under the Nebraska workmen's compensation law. Comp. St. 1929, secs. 48-101 *et seq.*

Thurston C. Bolen is plaintiff and P. B. Buller, doing business as P. B. Buller Company, and Employers Mutual Liability Insurance Company of Wisconsin, as its insurance carrier, are defendants. It is not disputed that the plaintiff is a cabinetmaker, employed by the Buller Company in such capacity at the time of the accident. It is not disputed that his wages were in the amount of $36 a week, and that, if entitled to compensation, he would be entitled to $15 a week for 125 weeks. On September 5, 1942, a judge of the workmen's compensation court granted an award to the plaintiff in the sum of $15 a week for a period of 125 weeks for permanent total disability, in the loss of the use of his left eye. Waiver of rehearing and notice of appeal to the district court were had, and on November 28, 1942, the district court affirmed the award. Defendants appeal.

The record discloses that at about 8 o'clock in the morning of February 2, 1942, the plaintiff, while in the course of his employment, suffered an accident. At the time he was operating a power circular saw, which made 3,200 revolutions a minute, and in cutting a board a small piece of the wood fell in the groove behind the saw, and when he shoved the saw back it picked up the small fragment of wood, threw it at great speed, and it struck plaintiff in the left eye. Thereafter he could not see out of this eye. The operation of the saw is detailed in the record. Plaintiff then lined up some work for two other employees, and in about two hours went to the office of Dr. Charles S. James. A short time after the accident his left eye became bloodshot, and there was blood in both corners of it, which condition remained for about a week. The whole eyeball was red, and there was blood inside of his left nostril for a week or two. It was recommended that the eye be removed, but

this was not done. Previously, on February 1, 1941, plaintiff suffered an injury to the same eye. At that time he was using a hammer, pounding a nail, and a small sliver of steel detached itself from the nail set and struck him in the eyeball. That afternoon he went to Doctor James, who treated his injured eye for two or three weeks, but did not remove the piece of steel. Plaintiff could not sleep as well as previously and was fitted with glasses, which he wore until October or November of 1941. His eyes were blue in color, but the injured eye turned brown. He testified that his vision in the left eye was sufficiently good to permit him to carry on his duties as a cabinetmaker; that he could read newspapers, measurement charts, play ball, and, in fact, had abandoned his glasses and noticed no particular effect from the injury. This evidence is corroborated by the superintendent and general manager of the firm for which he worked who, in addition, testified that plaintiff "had a very good mechanical eye." The witness restated the mechanism of the saw and said that he noticed no difference in plaintiff's work; that after the accident of February 2, 1942, he was unable to do his work. His wife testified that plaintiff was able to read newspapers, measurement charts and play ball after the first accident, and that after the second accident he was totally blind in his left eye.

The testimony of the experts offered by the defendants is in some respects in conflict. Doctor James testified that his examination of the plaintiff February 2, 1942, disclosed: "The cornea of the eye was denuded, and the anterior chamber was partially filled with the fluid, and the iris was distorted and irregular, and he had no vision in that eye." The plaintiff had given him a history of the accident. Previous to February 2, 1942, on June 26, 1941, the doctor examined the plaintiff and testified that at that time he "had vision, he could see to get around a room or out on the street, with the right eye closed;" was able to read ordinary newspaper type with glasses with the left eye; and on April 13, 1942, the doctor made a report to the insurance carrier that on June 26, 1941, his examination of the plaintiff for glasses

disclosed that with correction he had vision of 20/100 in the left eye; was able to read ordinary newspaper type, and on March 12, 1942, the date of the doctor's last examination, plaintiff's left eye was totally blind. The doctor further testified that if the left eye had been perfect on February 2, 1942, the injury would have caused total blindness; that he examined the plaintiff on June 17, 1941, and his records disclose that at that time, without glasses, plaintiff could only count fingers at five feet; that the loss of vision at that time, without glasses, in percentage, would be from 50 to 70 per cent.; that he did not use percentages under the Snellin system, "used the fingers in preference to the Snellin Chart," and the loss of vision, with glasses, was 40 per cent.

In his examination of the patient's eye on February 2, 1942, Doctor James testified he could not see past the crystalline lens, which indicated that plaintiff had a mature cataract, a complete cloudiness of the crystalline lens; that the lens capsule was not ruptured; further, from the time of plaintiff's first accident until he was examined for glasses, the doctor found nothing unusual; that an examination was had June 17, 1941, for glasses, and that on February 2, 1942, plaintiff "had some opacity of the lens; not an abnormal aspect, however."

Dr. Charles M. Swab testified that he examined the plaintiff on April 17 and 18, 1942. After obtaining the visual ratio and observing that the left eye was brown, he found that the color of the right eye was blue, while that of the left eye "was brownish in color," indicating that the patient had a foreign body injury that involved the inside of his eye, and which was confirmed by a later examination. The doctor "was able to see not only the track through the cornea, where the foreign body had punctured," but "was able to see the foreign body in the cornea." The doctor stated that this foreign body caused a condition known as "siderosis bulbi," which "occurs when a metallic substance, usually iron or steel, is present on the inside of the eyeball, * * * —the eye tissue acting on this metallic substance produces

a definite tissue reaction. These tissue reactions and local inflammation is manifest by changes in the crystalline lens, changes in the iris and other parts of the uveal tract and in the visual cells of the retina;" that the plaintiff had a mature cataract in the injured eye; that the left pupil was fixed and did not react to light, and there was a good deal of degeneration in the iris surrounding the place where the foreign body was lodged. From an examination with the slit lamp and the microscope, the doctor found that "in this tract through the cornea where the foreign body had passed, leaving a definite stain of rust, that there was this localized degeneration in the iris," and "there were clouds in the anterior chamber from an inflammatory condition." When told that Doctor James had said he could not find any scar on the cornea, which was the result of that metallic object going into the eye, the witness stated that the foregoing described it; that it was located in the iris, right underneath the old wound of the cornea.

With reference to the mature cataract, Doctor Swab testified: "It has to do with the opacity of the crystalline lens. In other words, it may be only a beginning of this condition, and then we refer to it as an immature cataract, and under changes it progresses to the place that the cataract becomes more pronounced and is still not total. Those cases we speak of as immature, too, but then there is a time that it is impossible to throw a strong light through the lens, then it is a mature cataract." The doctor was asked: "In this specific case, where the foreign body penetrated the cornea and lodged in the iris, could it have done so without interfering with the lens?" to which he replied that he did not think so, "because of the direction in which the foreign body was traveling, and striking the iris, which is real free, and a movable membrane extended across the anterior chamber, it would simply absorb the jolt, but there would have been a good deal of blow against the lens;" that it could have had a marked influence in the production of the cataract; that "a mature cataract causes a degree of reduced vision, in which the patient may still have light perception,

and even light projection. * * * That is blindness. * * * But it is the whole picture in siderosis bulbi, the cells are dead;" that from the history, the cause of the patient's blindness was siderosis bulbi. The witness stated that the record of Doctor James, "that the plaintiff could read 20/100 with a correction of a minus 2 sphere with his left eye on June 26, 1941," means that the patient was near-sighted in his left eye at that time, due to the beginning of an immature cataract. The witness testified that the injury of February 2, 1942, hastened the cataract formation, and that the wearing of glasses would not retard a developing cataract where siderosis bulbi existed.

On cross-examination, Doctor Swab testified that from plaintiff's condition on June 17, 1941, assuming that he could read all the necessary objects, the necessary orders at his place of business and identify things with his left eye, reading a newspaper with his left eye only, he was industrially blind.

Dr. W. H. Morrison, an instructor in ophthalmology, corroborated Doctor Swab's testimony and gave as his opinion, from all of the circumstances and existing conditions, that the plaintiff suffered from the disease of siderosis bulbi, and that the proximate cause of the blindness of plaintiff's left eye is that there had been a degeneration of the retina, occurring secondarily to siderosis bulbi. He testified in terms of the Snellin chart that finger counting "indicates that the vision is less than 22/100, and a 20/100 vision refers to vision which is considered industrial blindness, using the 22 as a basis for it."

The record admits of doubt as to a scar in the lower quadrant of the cornea. Many siderosis bulbi cases, Doctor Morrison testified, "go blind in a month or two months' time, to several years. It is slowly going down, the loss of vision, and so the patient will be completely blind and not realize it until something calls their attention to it, such as trauma." The foregoing constitutes the substance of defendants' testimony.

In an analysis of the record it is not the writer's desire

or inclination to attack the good faith of any of the expert witnesses in this case. The evidence of the plaintiff, of his wife, and of the superintendent and general manager of the plant in which plaintiff worked, as lay witnesses, is plain, simple and convincing. These witnesses testified definitely that the plaintiff had vision in his left eye after the first accident, and immediately after the second accident he was totally blind in this eye. He could read a newspaper, a measuring chart, and he was able to perform his duties as a cabinetmaker. His employer valued his services, and no question is raised as to his ability or competency to perform his duties, except that after the second accident he could not do his former work. True, the testimony of two of the experts called by the defendants conflicts with that of the plaintiff's attending physician with respect to the condition existing in the plaintiff's left eye and the cause of his blindness, or whether he was industrially blind, and such testimony cannot be reconciled. In a consideration and evaluation of such testimony, this court will consider the fact that the trial judge gave credence to the testimony of some of the witnesses, rather than to the contradictory testimony of others. See *Ames v. Sanitary District,* 140 Neb. 879, 2 N. W. (2d) 530, and cases cited.

Normally, the crystalline lens lies one-eighth of an inch back of the cornea. A blow on the cornea coming at such speed as a small piece of wood from a power circular saw, revolving 3,200 times a minute, would result in filling the anterior chamber with blood, would give a cloudiness of the lens and could cause total blindness. From a review of the evidence, this deduction is logical.

Section 48-121, Comp. St. 1929, as amended, provides in part: "The following schedule of compensation is hereby established for injuries resulting in disability: * * * (3) For disability resulting from permanent injury of the following classes, the compensation shall be in addition to amount paid for temporary disability; * * * For the loss of an eye, sixty-six and two-thirds *per centum* of the daily wages during one hundred and twenty-five weeks. * * * Per-

manent total loss of the use of a * * * or eye shall be considered as the equivalent of the loss of such * * * or eye." The foregoing section definitely fixes compensation for the loss of an eye without exception. See *Otoe Food Products Co. v. Cruickshank,* 141 Neb. 298, 3 N. W. (2d) 452.

Our statutes do not define the characteristics and powers of a normal eye. The legislative intent, therefore, is obvious. It is to compensate and indemnify the owner of an eye, capable of industrial use and injured in industry to the full extent of his industrial loss occasioned thereby. This view is held by the best reasoned cases.

After a careful review of the record, in light of the fact that the trial judge, who heard this case *de novo,* observed the witnesses as they testified, and from such proof rejected the theory of the defendants and accepted the theory of the occurrence of an accident, arising out of and in the course of plaintiff's employment, as the proximate cause which inflicted on the plaintiff total permanent blindness of his left eye, we conclude that the case was correctly decided and that the award should be affirmed.

Plaintiff's attorneys are allowed a fee of $100 for services in this court.

AFFIRMED.