GERALD L. CRABLE, APPELLEE, v. GREAT WESTERN SUGAR COMPANY ET AL., APPELLANTS.

90 N. W. 2d 805

Filed June 6, 1958. No. 34383.

*Wright, Simmons & Harris,* for appellants.

*Holtorf & Hansen,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.
This is a workmen's compensation case. After a hear-

ing before one judge of the Nebraska Workmen's Compensation Court, plaintiff, Gerald L. Crable, was awarded temporary total disability at $30 per week for 35 weeks from and including December 7, 1955, to and including August 7, 1956, and thereafter $16.38 per week for 265 weeks for 30 percent permanent partial disability to his body as a whole. Defendants, Great Western Sugar Company and London Guarantee & Accident Company, Ltd., the compensation carrier, were also ordered to pay for and on behalf of plaintiff $215 for medical services and $15 as reimbursement for expenses of a trip to Denver for medical examination, requested by defendants. Two certain claims for medical expenses were disallowed because incurred in preparation for trial and not for necessary medical treatment. Defendants having already paid same, they were given credit for $30 per week for 35 weeks for temporary total disability and for certain hospital and medical expenses.

After rehearing by the compensation court en banc, the award theretofore rendered was modified. In that respect, plaintiff was found to be totally disabled and was awarded $30 per week for 300 weeks from and after December 6, 1955, or until such disability sooner ceases, and if plaintiff should remain totally disabled after such period, defendants should pay him $25 per week for the balance of his lifetime, or until his total disability ends. Defendants were given credit for payments already made as allowed in the prior award, but were ordered to pay $209 for medical services by plaintiff's attending physician, $42.50 for X-rays taken by another physician, and $15 for travel expenses incurred on the trip to Denver by plaintiff.

Therefrom defendants appealed to the district court, whereat a judgment was rendered finding that plaintiff was totally disabled, and awarding him $30 per week for 300 weeks from and after December 6, 1955, and $25 per week thereafter for the balance of plaintiff's lifetime, or until disability ends. Defendants were given

credit for payments already made, and were ordered to pay certain medical and travel expenses as was done in the award from which defendants appealed, and ordered defendants to pay $100 attorneys' fees, taxed to defendants as costs.

Thereafter, defendants' motion for new trial was overruled and they appealed, assigning in substance that the trial court erred as follows: (1) In finding that plaintiff was totally disabled as a result of injuries caused by an accident on December 6, 1955, arising out of and in the course of his employment by defendant, Great Western Sugar Company, and in finding that plaintiff was entitled to an award upon such basis; (2) in ordering defendants to pay $209 for medical expenses rendered by Doctor Stewart P. Wiley, plaintiff's attending physician; and (3) in reimbursing plaintiff $15 for traveling expenses to Denver, which trip was made at defendants' request. We conclude that the assignments have no merit.

There are well-established rules of law which are applicable and controlling in the situation presented. In Feagins v. Carver, 162 Neb. 116, 75 N. W. 2d 379, we reaffirmed that: "An appeal to this court in a workmen's compensation case is considered and determined de novo upon the record."

In that connection, we said in Krajeski v. Beem, 157 Neb. 586, 60 N. W. 2d 651: "We said in Sporcic v. Swift & Co., 149 Neb. 246, 30 N. W. 2d 891: 'It is obvious that the evidence in the instant case is irreconcilable and in direct conflict. This being true, this court will consider the trial court's observation of the witnesses and their manner of testifying, and also that the trial court must have accepted one version rather than the opposite.' See, also, Sbarra v. Middle States Creameries, Inc., 140 Neb. 813, 2 N. W. 2d 26; Bolen v. Buller, 143 Neb. 237, 9 N. W. 2d 204. This applies to the compensation court where the matter was tried on rehearing and from which appeal was taken to the district court."

Also, in Feagins v. Carver, *supra,* citing and quoting from Jones v. Yankee Hill Brick Manufacturing Co., 161 Neb. 404, 73 N. W. 2d 394, we held: "A compensable injury within the Workmen's Compensation Act is one caused by an accident arising out of and in the course of the employment.

"An accident within the Workmen's Compensation Act is an unexpected and unforeseen event happening suddenly and violently and producing at the time objective symptoms of injury.

"In order to recover, the burden of proof is upon the claimant in a compensation case to establish by a preponderance of the evidence that personal injury was sustained by the employee by an accident arising out of and in the course of his employment.

"An award of compensation under the Workmen's Compensation Act may not be based on possibilities, probabilities, or speculative evidence.

"The rule of liberal construction of the Workmen's Compensation Act applies to the law, not to the evidence offered to support a claim by virtue of the law. The rule does not dispense with the necessity that claimant shall prove his right to compensation within the rules above set forth nor does it permit a court to award compensation where the requisite proof is lacking."

In Turner v. Beatrice Foods Co., 165 Neb. 338, 85 N. W. 2d 721, we held: "When an employee meets with an accident which accelerates or aggravates an existing impairment to a state of disability, such disability not being the result of a natural progression of the impairment, there may be an award of compensation therefor."

As held in Anderson v. Cowger, 158 Neb. 772, 65 N. W. 2d 51: "For workmen's compensation purposes 'total disability' does not mean a state of absolute helplessness, but means disablement of an employee to earn wages in the same kind of work, or a work of a similar nature, that he was trained for, or accustomed to per-

form, or any other kind of work which a person of his mentality and attainments could do.

" 'Earning power,' as used in subdivision (2), section 48-121, R. R. S. 1943, is not synonymous with wages, but includes eligibility to procure employment generally, ability to hold a job obtained, and capacity to perform the tasks of the work, as well as the ability of the workman to earn wages in the employment in which he is engaged or for which he is fitted."

Further, as held in Elliott v. Gooch Feed Mill Co., 147 Neb. 612, 24 N. W. 2d 561, cited with approval in Haler v. Gering Bean Co., 163 Neb. 748, 81 N. W. 2d 152: "An employee may be totally disabled for all practical purposes and yet be able to obtain trivial occasional employment under rare conditions at small remuneration. The claimant's status in such respect remains unaffected thereby unless the claimant is able to get, hold, or do any substantial amount of remunerative work either in his previous occupation or any other established field of employment for which he is fitted." See, also, Elliott v. Gooch Feed Mill Co., 147 Neb. 309, 23 N. W. 2d 262.

In the light of such rules, we have examined the record, which as summarized discloses the following material facts: On December 6, 1955, plaintiff, a farmer and common laborer with an eighth-grade education, was an employee of defendant, Great Western Sugar Company, working the 4 p. m. to 12 midnight shift at said defendant's factory in Gering. At that time plaintiff was about 52 years of age, and was earning $81.92 per week. On December 6, 1955, at about 11:30 p. m. he was fluming frozen beets from a pile of beets outside defendant's factory. Plaintiff worked alone because it was a dangerous process. The beets, weighing an average of 3 or 4 pounds each, were piled about 20 feet high up from the bottom of the flume. Metal pallets covered the top of the water in the flume upon which they piled the beets to thaw them out, then carry them on into the factory. Plaintiff was down in the water about 2

feet deep in the flume removing the metal pallets. As he was doing so, the foreman, without plaintiff's knowledge, came up behind him, and, using a rod about 20 feet long, prodded some of the frozen beets down into the flume. As they came down, the foreman hollered, but his warning was too late, and plaintiff jumped back as far as he could, but was thrown and hit the back of his head on a heavy sill, which knocked plaintiff unconscious. When he regained consciousness, he was up on the bank about 100 feet along toward the tracks, where other employees of defendant had carried him.

When plaintiff became conscious, he was beat up all over. His neck and back pained him. His glasses had been knocked down and skinned his nose all the way down, and evidently one frozen beet had hit him in the face, which left a scar above his nose. He was then taken home, where he could not lie down or sleep, and the next morning his right ear started to drain a light blood-tinged fluid which so continued to drain for several days.

The next day, December 7, 1955, plaintiff got an order from defendant's superintendent in see Doctor Wiley, a physician and surgeon in Gering. Plaintiff reported for work that night and two following nights, but was unable to do any work, so the foreman told him that there was no use to come back if he couldn't work; to go home and stay there. On the afternoon of December 7, 1955, plaintiff's stepson took him to Doctor Wiley's office, where plaintiff was examined. At that time, he had the laceration aforesaid on his face and pains in his head, neck, and back, but examination showed no definite signs of fractures or dislocations. Plaintiff was then "still pretty hazy," and it was thought that he had a brain concussion and a sprained neck and back. He was given sedatives, sent home, and told to stay in bed, but to return the next day. Plaintiff did so, but continued to have considerable pain all up and down his head, neck, and back. He was given diathermy treatment and in-

travenous muscular relaxants. Doctor Wiley saw and treated plaintiff almost every day thereafter without obtaining any improvement.

On December 19, 1955, the doctor had complete X-rays taken of plaintiff's neck and back, which did not reveal any dislocation or fractures. Thereafter, plaintiff was regularly given physiotherapy treatments and medication, but showed no improvement. Rather, he continued to have pain in his back, neck, and head, and developed a ringing in his right ear, with diminished hearing. On February 16, 1956, Doctor Wiley placed plaintiff in a hospital with traction on his neck for several days, which produced no improvement. In that connection, contrary to defendants' contention, we find no evidence in this record which would support the conclusion that plaintiff was ever ordered to continue or resume such traction but refused to do so.

Before the accident, plaintiff had always been able to work regularly as a farmer and laborer without any pain or disability. Doctor Wiley had been plaintiff's family physician for several years. He had seen plaintiff in his office many times when plaintiff came with his children for their treatments, but plaintiff had never theretofore complained or required any medical attention. The X-rays had disclosed a minimal osteoarthritis, and another physician had reported that plaintiff had an elevated sedimentation rate. Thus, believing that plaintiff's trauma was associated with arthritis and that he might be benefited, Doctor Wiley started giving plaintiff steroids, a type of cortisone. In that connection, Doctor Wiley testified that trauma such as plaintiff had "aggravates an arthritic change—in fact, trauma causes osteoarthritis," which of itself is not very painful. However, the steroid treatment produced no improvement, so physiotherapy and other medication were tried again, but plaintiff continued to have a stiff neck, shoulder, and back, with demonstrable acute pain and muscle spasm on motion in all dimensions, and pain in the back

of his head which traveled upward to the front thereof, causing dizziness or blackouts. In the meantime, plaintiff was encouraged to try to work and he did try, but was physically unable to work except for short periods of time, and, knowing of plaintiff's condition, employers repeatedly refused to give him an opportunity to try to work. During the last 6 months plaintiff also developed a pain around his chest, a shakiness, difficulty in sleeping, and a pounding of his heart with no organic difficulty apparent therein.

Doctor Wiley saw and treated plaintiff on some 61 occasions for which charges were made, but he also saw and visited with plaintiff many times for which no charge was made. The evidence discloses that Doctor Wiley's charges, which totalled $209, were for necessary medical treatment, and that they were fair and reasonable, as was the charge of $42.50 for X-rays taken at Doctor Wiley's request by Doctor Sorensen, a radiologist. We conclude that the court properly and correctly ordered defendants to pay same, which disposes of defendants' second assignment of error.

Doctor Wiley was plaintiff's attending physician at all times since the accident, and he testified that plaintiff was totally disabled, which disability was caused by plaintiff's accident and injuries theretofore received on December 6, 1955.

Doctor Hilton, a neurologist in Denver, examined plaintiff on April 10, 1957, in the light of the history aforesaid. He found a tenderness to pressure over the muscles of plaintiff's upper back, shoulders, and neck. Flexion forward caused radiation of pain upward toward the back of plaintiff's head. Doctor Hilton's opinion was that plaintiff, as a result of the accident, had received a sprain of the muscles of his upper back and neck, and there was also a strong probability that plaintiff suffered a basal skull fracture because of the drainage of blood-tinged fluid from his right ear after the accident.

In that connection, plaintiff also had a nervous or emotional disturbance causing an anxiety reaction due to pain and his chronic condition, which accounted in part for plaintiff's heart palpitation, shakiness, and inability to sleep. The doctor's opinion was that as a laborer plaintiff had a total disability of the body as a whole which was caused by the accident.

Doctor Cowan, a surgeon at Scottsbluff, examined plaintiff on November 26 and 27, 1956, February 5, 1957, and July 16 and 22, 1957. In doing so, he also examined the X-rays heretofore mentioned, and considered the history heretofore recited. Doctor Cowan testified that from November 26, 1956, to July 22, 1957, plaintiff's condition remained about the same, and gave his opinion that plaintiff was totally disabled and that same was caused by his accident on December 6, 1955. In that connection, Doctor Cowan's examination disclosed a straightening of plaintiff's cervical spine; rigidity of the posterior muscle masses of his neck; a limitation of flexion, extension, and rotary motions of the cervical spine; and dizziness upon extension of plaintiff's neck. Pressure upon the top of plaintiff's head produced pain in his neck, and traction on plaintiff's head caused no change in his discomfort. The doctor concluded that plaintiff's total disability was traceable to pain; a bilateral muscle weakness in both upper extremities; an area of hypoesthesia in the skin of his upper right extremities related to the radial and ulnar nerves; a straightening of the lumbar spine; muscle spasm in the erectus spiny masses; positive straight leg raising on the right, but negative on the left; a diminished left ankle jerk with pronounced hypoesthesia in that area of skin intermated by the nerve root arising from defined inner spaces; and demonstrable muscle weakness of the anterior tibial muscle group on the right. One factor or element considered by Doctor Cowan in ascertaining the cause of plaintiff's total disability was that plaintiff had a watery, pink-tinged drainage from his right

ear for several days after the accident, and said: "If that fact is true (which is not denied) I feel that this individual may have very well sustained a skull fracture * * * Basal skull fracture." In that connection, he testified that he would anticipate that a basal skull fracture would show up in an X-ray, but some such fractures are not so discoverable, depending on the type of fracture and when the X-rays were taken after the accident.

Plaintiff was called as a witness for defendants, and as such testified that he had never had any injury to his neck, head, or back prior to December 6, 1955, and that some X-rays taken by Doctor Sorensen in 1951 of his neck area and all other parts of plaintiff's body, were taken to find out where a blood clot in his leg had come from, which was not contradicted. On cross-examination by plaintiff's counsel, plaintiff testified that after those X-rays were taken, he had always been able to do his normal work on the farm.

Doctor Newman, an orthopedist from Denver, was called as a witness for defendants. He examined plaintiff on May 18, 1956, and again on April 9, 1957. In doing so, he considered the history heretofore recited. He testified that at the first examination, plaintiff had a tenderness generally over his spine, from the neck down, and in the muscles on either side of his spine, with a limitation of motion in his neck about one-half or two-thirds from normal in all directions, and muscle spasm or tightness on either side of his neck and back, protecting against pain in his head, neck, and back; that plaintiff had some diminished sensation in the right upper extremity which did not demonstrate any specific nerve root irritation; and that plaintiff had some weakness of grip in his right hand. X-rays showed some increased density over the upper bony prominence of plaintiff's right shoulder, with two small areas of demineralization, which suggested some inflammatory change of low grade over a long period of time, explained

upon the basis of either a synovitis or a tendovaginitis, cousins more or less to arthritis. X-rays of plaintiff's neck appeared normal, but X-rays of plaintiff's lower back and dorsal spine, and a sedimentation test, showed or indicated some arthritic change. Doctor Newman's opinion from his first examination was that plaintiff was totally disabled for ordinary labor by an arthritic process along with an injury, probably a sprain of his neck and back, caused by the accident. In other words, that the two combined to give plaintiff such disability.

Doctor Newman's examination on April 9, 1957, produced physical findings very similar in material respects to those found in his first examination. X-rays taken again of plaintiff's neck region showed no material difference, but his sedimentation rate had slightly increased. His opinion was that plaintiff was still generally disabled from doing ordinary work. He thought plaintiff then had had time to recover from the sprain, and his disability then was "fundamentally from an arthritic process." Be that as it may, from the set of X-ray films available to Doctor Newman at the first examination, he reported: " 'There was no evidence of bone injury observed about the shoulder girdle. X-rays of the cervical spine showed excellent weight bearing allignment (sic), normal intervertebral spacing * * * No evidence of arthritic change.' " In that regard also, he testified: "I didn't observe any particular difference in the two sets of films, was my notation on the negative." With reference to the question of basal skull fracture, Doctor Newman testified that the only symptomatology thereof was that plaintiff was caused to be unconscious, which could be explained by a concussion caused by the accident. His periods of blackout could perhaps be explained on that basis, and his headaches could be an accompanying complication, but he thought they were from the muscle spasm in plaintiff's neck, with radiated pain that comes up over the back of plaintiff's head. Doctor Newman examined the

X-rays taken as aforesaid in 1951, and compared them with those subsequently taken by him. In doing so, he noticed a little difference. The comparison indicated a little narrowing of the joint cartilage from the fourth, fifth, and sixth vertebral levels, but admitted it was possible that such indication might be photographic only. He thought that plaintiff needed medical treatment, general medical management, and care, to try and find out if there were areas of low-grade infection which plaintiff might be absorbing; to see that plaintiff got proper rest and physical therapy; and to try treatment with steroids again if plaintiff's general medical physician thought best.

Doctor Riddell, a physician and surgeon of Scottsbluff, was called as a witness by defendants. Having in mind the history heretofore recited, he examined plaintiff on July 31, 1956, and February 15, 1957. He took X-rays of plaintiff's head and neck, which revealed "no evidence of any old fracture in the *frontal region,* but I thought there was a *slight thickening* or artefact in the *mid posterior part of the occipital bone,* that is back here (Indicating)" but "I did not feel that that had anything to do with his symptoms." (Italics supplied.) Plaintiff had about 50 percent loss of hearing in his right ear and 25 percent in his left ear. He had a stiffness and pain in his neck on rotation or flexion, and as subjective symptoms, complained of a ringing in his ears, and recurrent headaches, which the doctor testified could be caused by concussion at time of injury, or to a psychotic reaction, or could have something to do with his false teeth, which often caused headaches or deafness. The doctor could see no reason why plaintiff could not be doing some kind of work because he was unable to discover sufficient clinical findings to totally disable plaintiff.

At Doctor Riddell's examination of plaintiff on February 15, 1957, plaintiff complained of recurrent headaches, stiffness of neck and back, deafness more in his

right ear, pain in his lower back, and that he was unable to work. The doctor found that plaintiff had a spastic muscle rupture of the neck and muscle to support the head, and on circumduction plaintiff complained of pain. On special examination of the lower segments of plaintiff's spine, he found that plaintiff had limitation on flexion of the legs or thighs on the trunk, and there was some definite restriction in flexion of the cervical spine. X-rays of the cervical spine disclosed no evidence of any old or new injury or degenerative process, but there was an osteoarthritis of the third, fourth, and fifth lumbar vertebrae, with some calcification and some such changes in the eleventh and twelfth dorsal vertebrae, all of which had no connection with plaintiff's accident. His opinion was that plaintiff had recovered from his injury caused by the accident, but that he had some disablement of the body as a whole, caused by arthritis or other processes in his body. Doctor Riddell admitted that it was debatable whether or not plaintiff's deafness was attributable to the accident, and admitted that plaintiff's headaches could be the result of concussion or psychosomatic reaction.

We conclude that a preponderance of competent evidence established that plaintiff was totally disabled, and that such disability was caused by his accident while employed by defendant, Great Western Sugar Company, on December 6, 1955, as found and adjudged by the workmen's compensation court and the trial court.

It is admitted that defendants paid plaintiff for temporary total disability for 35 weeks from December 15, 1955, to August 15, 1956, and paid certain medical and hospital bills for which defendants were given credit. In addition, on May 18, 1956, during plaintiff's admitted temporary total disability, plaintiff took a trip to Denver at defendants' request for an examination by their witness, Doctor Newman, for the purpose of preparing their defense. For such trip defendants ad-

mittedly advanced $25 to plaintiff for expenses. At the trial, without any objection or contradiction or even cross-examination with regard thereto, plaintiff was permitted to testify that the trip cost him $40; that not being able to drive that far, he hired a driver of his car for $10; that it became necessary to stay there and pay for two nights' lodging; all of which cost plaintiff $15 more than the $25 defendants had advanced for such trip. Defendants assigned that the district court erred in ordering defendants to pay such $15, which in effect affirmed the orders of the workmen's compensation court.

Defendants relied upon Newberry v. Youngs, 163 Neb. 397, 80 N. W. 2d 165, wherein we held: "Section 48-120, R. R. S. 1943, making the employer liable for reasonable medical and hospital services, includes the cost of travel incident to and reasonably necessary for obtaining such services." However, such case is not decisive of the question.

Evidently defendants are in no position to dispute that the cost of such trip was incident to and reasonably necessary for obtaining a medical examination of plaintiff by their own witness, Doctor Newman. Defendants' contention here is based upon the fact that there was no direct, specific evidence that the cost of $40 was a reasonable cost. We think that under the circumstances presented here, evidence as to cost incurred at defendants' request and received without objection, together with a lack of any effort on the part of defendants to show in any manner that it was not the reasonable cost, was sufficient prima facie proof that it was reasonable.

In Nosky v. Farmers Union Cooperative Assn., 109 Neb. 489, 191 N. W. 846, cited with approval in Gilmore v. State, 146 Neb. 647, 20 N. W. 2d 918, this court held: "Where the evidence shows that certain hospital and nurse expenses have been incurred by the injured employee, a prima facie case is made out, and, in the

absence of any showing that the expenses so incurred were unreasonable, such proof will be held to be sufficient."

In that opinion, this court said: "Lastly, it is urged that the evidence does not support the judgment, particularly with reference to the allowance of the hospital and nurse expenses. With respect to these items, the plaintiff's evidence does not go beyond the point that they were incurred by him, and defendant does not show that they were unreasonable or unjust charges. Considering the somewhat informal manner in which cases of this character are tried, we are inclined to hold that the proof offered was sufficient to make out a prima facie case, and, in the absence of any attempt to show that the expenses so incurred were unreasonable or exorbitant, it will be held to be sufficient." See, also, Sorensen Construction Co. v. Broyhill, 165 Neb. 397, 85 N. W. 2d 898. Defendants' contention has no merit.

For reasons heretofore stated, we conclude that the judgment of the trial court should be and hereby is affirmed. Also, in conformity with the rule in Haler v. Gering Bean Co., *supra,* plaintiff is allowed $500 as attorneys' fees for services of his counsel in this court, taxable as costs, all of which are taxed to defendants.

AFFIRMED.